CoweN, Ghief Judge,
delivered the opinion of the court:
By H. Bes. 621, 85th Cong., 2d Sess., the House of Bep-resentatives has asked us, pursuant to 28 U.S.C. §§ 1492 and 2509, for a report as to whether plaintiff is legally or equitably entitled to additional compensation for services and materials furnished in connection with a research and development contract for the removal of snow and ice from airfield runways.[1]
Plaintiff, a Government contractor, claims $140,759.29 as additional expenses incurred in the performance of the contract.
In 1948 or 1949, as a result of its experience in the Berlin Airlift, the United States Air Force determined that it re *321 quired a high, speed snowplow that could quickly clear a runway. In 1950 a snow removal project was assigned to tke Engineer Research and Development Laboratories, Fort Belvoir Virginia, hereinafter referred to as ERDL.
After an initial survey of standard commercial snowplows, it became apparent that none was of sufficient size and speed to accomplish the results desired by the Air Force. Sometime in late 1950 or early 1951, ERDL began to call in representatives of the snowplow industry and to elicit their ideas.
Plaintiff is a New York corporation primarily engaged in the export-import business. In 1948 it acquired Hill Diesel Engine Corporation of Lansing, Michigan, but plaintiff sold this facility in October 1952. This was plaintiff’s only self-oiwned manufacturing facility. Sometime prior to execution of the contract at issue, plaintiff employed Glen Bevan, who was experienced in the snowplow field, for the specific purpose of developing the snowplow involved in this case. Mr. Bevan was plaintiff’s major, if not sole, source of expertise on snowplows and was primarily in charge of the work performed by plaintiff under the contract. Mr. Sev-an’s contract of employment with plaintiff provided for his participation in any profits realized from sales of the snowplow to be developed.
In May of 1951, Mr. Bevan discussed the snowplow project with ERDL personnel, including Frank M. Austin, the project engineer. Mr. Bevan suggested a design for a snowplow which included use of an aircraft engine to power a rotor system that he had developed.
Later in May of 1951, ERDL sent requests for proposals to five snowplow firms, including plaintiff. The request set out certain performance requirements to be met by a snowplow to be designed and produced by the contractor receiving the contract.
In June of 1951, plaintiff submitted a proposal generally conforming to the Government’s specifications but stating certain exceptions. Plaintiff was the only firm to submit a satisfactory proposal.
The parties entered into negotiations based on plaintiff’s proposal and a contract, No. DA-44-009 eng-968, was duly executed in January of 1952. The contract was denom *322 inated: “Contract for Research, Development and Technical Services”. In addition to the standard contract clauses, it provided that:
(1) For compliance with the contract, plaintiff was to be paid a fixed price of $126,089.26, subject to a maximum upward adjustment of 10 percent after a price redetermination based on a statement of costs furnished by the contractor within 30 days after completion or termination of the contract.
(2) Plaintiff was to design, construct, test and deliver one snowplow that met the stipulated specifications.
(3) The specifications were “performance” specifications, i.e., plaintiff was given complete freedom in the design and construction of the snowplow but was required to deliver a product that would perform as specified. The principal requirement of the specifications was that the unit would be capable of removing, at a speed of 30 miles per hour, a path of snow 30 feet wide by 2 inches deep, weighing 10 pounds per cubic foot, and of discharging 90 percent of the snow a minimum distance of 250 feet from the unit.
(4) Defendant was to furnish plaintiff a Wright model 3350-57 aircraft engine with accessories for use in the snowplow.
By March 1952, the snowplow had been fabricated at plaintiff’s Hill Diesel plant, and was then taken (at plaintiff’s expense) to the Michigan National Guard Airport at Gray-ling, Michigan, for “shakedown” testing. As initially constructed, the front end of the plow consisted of a multi-bladed rotor revolving within a rotor case. The rotor shaft was connected to an airplane engine, which supplied the power for the rotor. This equipment was mounted upon a frame of steel girders which, in turn, was mounted upon the carrier vehicle, a large 6-wheeled truck chassis turned backwards. Due to starter and fuel system trouble, the plow was returned to Hill Diesel for further work. Later tests, in April 1952, indicated that there were rotor blade problems. Work continued on the plow during the summer of 1952.
In December 1952, after the snowplow had been returned to Grayling for further testing, it became apparent that a *323 governor would be required on the aircraft engine to insure a controllable power source. The governor was provided by plaintiff at its expense.
Acceptance tests on the snowplow were continued at Gray-ling in the January-March 1953 period. Although the testing was hampered by some warm weather and the fact that the snow season ended early in 1953, it was demonstrated by March 25,1953, that the unit was overweight by approximately 20,000 pounds. As a result, it was impossible to shift the gears on the carrier while it was in motion due to the resistance of the snow load and the weight of the entire unit. The use of a torque converter or fluid coupling with an automatic transmission on the carrier was suggested to avoid the necessity of shifting gears. Since plaintiff had disposed of its only manufacturing facility in October 1952, it became necessary for plaintiff to construct a temporary structure at Grayling in order to perform this work on the snowplow. The structure was erected at plaintiff’s expense.
Sometime prior to May 1, 1953, plaintiff found that it had already expended more on the snowplow than the total contract price. This information was furnished to the defendant’s project engineer and his superior, who agreed to recommend an increase in the contract price. On May 1, 1953, plaintiff wrote the contracting officer, stating that two major deficiencies (excessive weight and inability to meet speed requirements) in the snowplow had developed during the testing and that plaintiff proposed to correct these by redesigning the unit in several respects. The letter further related that plaintiff was prepared to remedy the principal defects at its own expense but that defendant’s engineers had suggested that the carrier should be modified to include a torque converter and a torquematic transmission. The letter concluded with a statement that plaintiff was prepared to make all the modifications mentioned, provided that the contract price was increased by the sum of $35,000.
Early in June 1953, four officials of EKDL met with plaintiff’s president, plaintiff’s attorney, and Mr. Bevan, in New York to discuss the problem. At that time plaintiff’s officials were informed that defendant had determined that *324 the proposed modifications in the snowplow were within the scope of the contract and that the request for a $35,000 increase in the contract price would not be approved. Mention was also made of the possibility of the Government’s termination of the contract. A second conference was held at Fort Belvoir on July 2, 1953, between representatives of EBDL and those of plaintiff, including John Briggs, one of plaintiff’s directors who had been sent from London by Kleinwort Sons and Company (which wholly owned plaintiff) with full authority to act for plaintiff. It was made clear to plaintiff that the contract would not be modified except to extend the time for completion of the contract. However, plaintiff’s representatives were informed that they could use any means at their disposal for meeting the contract requirements.
On July 14,1953, plaintiff entered into a subcontract with the American Bantam Company to bring the snowplow within contract specifications. This subcontract was predicated on engineering advice secured from Yitro Corporation of America which had been retained for this purpose by plaintiff.
In December 1953, the snowplow was again taken to Grayling for tests. In January 1954 tests, the rotor buckets failed. In February 1954, the Government-furnished aircraft engine caught fire. It was determined by EBDL that the fire was not the plaintiff’s fault.
The fire-damaged engine was remqved and replaced by another Wright aircraft engine furnished by defendant. In a test run on Match 17, 1954, plaintiff’s operator drove the plow into a snow windrow, whereupon two of the shafts were broken. The shafts were replaced and other damage was repaired at Bay City, Michigan, but no further tests could be conducted, inasmuch as the snow season had ended.
At the close of the second snow season in 1954, the snowplow still had not met the requirements of the specifications. Plaintiff advised defendant that it desired to discontinue the project and be relieved of further efforts under the contract. At the suggestion of one of defendant’s representatives, plaintiff wrote the contracting officer on May 13,1954, requesting that the contract be terminated for the conven *325 ience of the Government and that plaintiff be paid the balance due under the contract. On October 21, 1954, the contract was terminated for the convenience of the Government and plaintiff submitted a termination claim of $296,-112.14, which was later increased to a total of $324,695.24. An audit of the plaintiff’s records showed that it had expended more than the maximum contract price. Thereafter, the parties entered into a supplemental agreement in which it was agreed that plaintiff would be paid the maximum contract consideration of $138,698.19, including the upward adjustment of 10 percent of the fixed price. Since plaintiff had already received $108,864.93 from the Government, plaintiff was paid the remainder of $29,833.26. In the supplemental agreement, plaintiff released the Government from all rights and liabilities under the contract.
Plaintiff’s claim consists of five separate items, which are estimates only and cannot be verified by audit. Plaintiff produced no records showing the costs actually incurred on any of its estimated claims. Sometime after American Bantam Car Company completed its subcontract, its records were destroyed. Plaintiff has not been able to locate the cost records of Hill Diesel Engine Co. Following an audit made in accordance with the pretrial procedures of this court, the parties have stipulated that plaintiff spent at least $140,159.29 over, and above the amount received under the contract. Of this amount, $32,552.01 was expended by plaintiff after the fire on February 2,1954, but the evidence does not show how much of this expenditure was due to the fire itself.
Although it was unable to supply a snowplow which met the requirements of the specifications, plaintiff put forth its best efforts, and there was no fault or negligence attributable to it in the performance of the work. It is conceded that the contract was impossible of performance.
I
The supplemental agreement which plaintiff executed upon the termination of the contract released the Government from all liabilities without reserving or excepting any claims now asserted by plaintiff. The release bars a legal cause of action. *326 J. G. Watts Construction Company v. United States, 161 Ct. Cl. 801 (1963). The evidence does not establish, that the contracting officer, or anyone authorized to act for him, approved any change or other modification in the contract to increase the amount due plaintiff. Plaintiff cannot recover on a contract modification unless the change is approved by an authorized agent of the Government. Potter v. United States, 167 Ct. Cl. 28 (1964). Plaintiff concedes that it does not have a legal claim upon which to predicate recovery.
II
The bill, H.R. 1357, which accompanied the reference from the Congress, proposes to pay plaintiff the sum of $185,996.95 and further states:
The payment of this amount is in reimbursement to the said Drake America Corporation for services and materials furnished in the performance of a research and development contract (No. DA-44-099-eng-968) [sic] between the Company and the United States; the company having proceeded on its understanding that proper approval by Government contracting officers to incur the expenses and advance the funds required for this purpose would be forthcoming:
The language of this bill, as supplemented by plaintiff’s pleadings, presents the principal issue for, our determination, namely, whether plaintiff has an equitable claim because of its understanding, in reliance upon representations of Government officials, that its excess expenditures under the contract would be approved and reimbursed by authorized contracting officers of the Government.
The elements which constitute an equitable claim as broadly defined in Burkhardt v. United States, 113 Ct. Cl. 658, 667, 81 F. Supp. 553 (1949), cannot be itemized in an inflexible formula. The facts and circumstances of each case must be weighed to determine whether the conscience and honor of the sovereign dictate that plaintiff should receive compensation that is not recoverable under a legal cause of action. However, where, as in this case, plaintiff’s equitable claim is based on its reliance upon representations *327 of Government officials, we think plaintiff has the burden of proving, not only that such representations were made, but that there were reasonable grounds for its reliance thereon and that its damages were directly attributable thereto. B Amusement Co. v. United States, 148 Ct. Cl. 337, 342, 180 F. Supp. 386 (1960); Krueger v. United States, 161 Ct. Cl. 599 (1963).
Plaintiff has filed exceptions to the trial commissioner’s report because of his failure to make findings of fact requested by plaintiff to the effect that plaintiff believed, on the basis of statements made by Government officials, that it would be reimbursed for the damages claimed in this action and that the Government requested plaintiff to make changes in the contract and specifications. We have made some additions to the commissioner’s findings but, as we shall point out below, we are convinced, after a thorough review of the evidence, that the trial commissioner’s determinations are supported by a clear preponderance of the evidence.
There is no doubt that plaintiff’s request of May 1, 1953, for an addition to the contract price in the sum of $35,000 was supported and recommended by Mr. Austin, the project engineer, and by Mr. Kinker, his superior. However, it is equally clear from the record and conceded by plaintiff that the requested modification was rejected by the Government in two significant meetings which were held on June 25,1953, and July 2,1953, respectively. Besides the Government officials present, plaintiff was represented at the first of these meetings by its president, its attorney, and by Mr. Bevan, and at the second, by John Briggs, plaintiff’s director from London, who had been sent there by the parent corporation for the purpose of determining a course of action for plaintiff. Much of the discussion in each of these two meetings centered on plaintiff’s plans for modification of the snowplow to meet the requirements of the specifications, including plaintiff’s proposed subcontract with the American Bantam Car Company. It is not disputed that in these meetings plaintiff was informed and understood that defendant had decided that the proposed modifications in the snowplow fell within the scope of the contract and did not *328 constitute changes for which (plaintiff was entitled to compensation under the provisions of the contract. The evidence does not establish that any officer of the Government thereafter promised plaintiff that the contract price would be increased to cover the costs subsequently incurred by plaintiff.
When we turn from the testimony of the witnesses to the documentary evidence in the record, we find little or no support for plaintiff’s position. In a written memorandum which Mr. Austin’s superior received on July 14, 1953, Mr. Austin stated that John Briggs, the highest official of plaintiff who participated in the conferences with Government officials, understood that no modifications would be made in the contract except to extend the time for delivery of the snowplow. Quoted in our findings of fact are four written communications from plaintiff to defendant: The first on May 1, 1953 (finding 32); the second on July 8, 1953 (finding 36); the third on May 13, 1954 (finding 47), and the fourth on December 16,1955 (finding 52). In none of these letters is there an expression or even an indication that plaintiff had incurred expenses in excess of the contract price in reliance on statements of Government officials that reimbursement would be forthcoming.
Finally, it is to be noted that plaintiff was represented by an attorney during the performance of the contract. He participated in at least one of the meetings between defendant’s representatives and plaintiff’s officials. Upon his advice, plaintiff executed a supplemental agreement which released the defendant from all liability of the contract and which did not reserve or except from the release any additional claims.[2]
This is not a case in which plaintiff incurred losses in reliance upon representations made to it by a Government agent with apparent authority to act in behalf of the Government. In the contracting officer’s letter of December 19, 1951, to plaintiff, the duties of Mr. Austin, as project en *329 gineer, were enumerated in detail. It was explicitly stated that he had no authority to modify the terms of the contract or specifications, nor to approve any action which would result in additional charges to the Government. These limitations upon the authority of the project engineer were well understood by him and by plaintiff’s representatives.
We do not doubt that after plaintiff began to experience difficulties with the snowplow, Mr. Austin stated to plaintiff’s representatives on several occasions that he would support their efforts to obtain additional relief. However, it is clear from his testimony that he made no promises to the plaintiff, for both he and plaintiff knew that he could not obligate the Government to pay anything in addition to the contract price. To the extent that plaintiff relied upon such statements of Mr. Austin in incurring the additional expenses claimed here, the reliance was unreasonable and does not provide the basis for an equitable claim against the Government.
Ill
We next consider whether, in view of the experimental nature of the contract, the efforts which plaintiff exerted in good faith to design a snowplow that would meet the requirements of the specifications, and the impossibility of performance, the benefits derived by the defendant from the contract are sufficient to constitute an equitable claim against defendant for additional compensation.
In view of the fact that the contract was one for research, development and technical services, the parties might well have contracted on a cost-plus-fixed-fee basis. Instead, they executed a fixed-price contract which contained only a 10-percent contingency factor for the risks assumed by plaintiff.
The specifications of the contract were couched in terms of the performance expected by the defendant, leaving the plaintiff completely free to design and construct a snowplow that would meet the stated requirements.
At the time the contract was entered into, plaintiff was not regularly engaged in the manufacturing business. It had had no previous experience with snowplows. For this spe *330 cial contract, it employed Mr. Bevan, a man who had ideas on the development of a snowplow that would meet the Government’s specifications, with which he was thoroughly familiar. We think it inferable from the record in this case that Mr. Bevan sold his ideas to the plaintiff and to the Government. Thus, in its proposal of June 13, 1951, plaintiff advised ERDL that the Drake Dreadnaught Rotary Snowplow would meet or exceed all the Government’s requirements, except that the plow would not be able to discharge snow 150 to 500 feet away from the plow against a 20-mile per hour wind. Mr. Bevan’s contract of employment provided that he was to share in plaintiff’s profits if the snowplow proved to be successful.
Mr. Bevan and plaintiff anticipated that substantial profits would be made on sales to the Government and. to commercial customers if plaintiff could design a plow that accomplished the objectives of the specifications. Since plaintiff represented that it had the expertise for the solution of the Government’s snow removal problem, perhaps a large share of the burden of impossibility of performance falls upon it.
Against these circumstances, however, we should balance the defendant’s need for a snowplow to meet its rigid and optimistic specifications, together with whatever benefits it derived from the contract. Defendant contends that all it received in exchange for an expenditure of more than $138,000 was the knowledge that plaintiff’s snowplow would not work. We disagree. The Government learned that the art of snow removal was not sufficiently advanced at that time to accomplish the objectives of the Air Force. After observing the test runs of the Drake plow, another Government snowplow contractor made some modifications in his unit which resulted in increased production and a discharge of snow at a greater distance from the plow. From a negative standpoint, the defendant also found that a carrier vehicle of the size and weight used by plaintiff was unsuitable and that certain other features should not be incorporated in large plows for removing snow from airfield runways.
Had it chosen to do so, the defendant could have terminated the contract because of plaintiff’s default. Instead, it elected *331 to terminate tlie contract for its convenience and paid plaintiff the maximum contract price, the same amount it had obligated itself to pay for successful performance. We think this was done because the Government realized that plaintiff had made every effort to develop the snowplow called for and that its failure was due to the impossiblity of performance rather than to plaintiff’s fault or negligence. Although we are unable to approximate the value of the benefit derived by the Government, it is our opinion that defendant paid plaintiff a fair consideration for whatever it received.[3]
For the reasons stated above, we conclude that plaintiff has neither a legal nor an equitable claim against the United States for the losses incurred in the performance of the contract.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Representatives pursuant to its resolution of reference.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follow:
1. This case arises as a result of H. Res. 621, adopted by the House of Representatives, 85th Cong., 2d Sess., on July 29,1958, which resolution provided:
Resolved, That the bill (H.R. 1357) entitled “A bill for the relief of Drake America Corporation”, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House of Representatives, at the earliest practicable date, giving such findings ol fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
*332 2. H.R. 1357, 85th. Cong., 1st Sess., the bill referred to this court for consideration, provides:
A Bill
For the relief of Drake America Corporation.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury be, and he is hereby authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Drake America Corporation, 20 East Fiftieth Street, New York, New York, the sum of $185,996.95. The payment of this amount is in reimbursement to the said Drake America Corporation for services and materials furnished in the performance of a research and development contract (No. DA-M — 099-eng-968) between the company and the United States; the company having proceeded on its understanding that proper approval by Government contracting officers to incur the expenses and advance the funds required for this purpose would be forthcoming: Provided, That nothing in this Act does or shall affect the right, title, and interest in and to any claim which the Government of the United States has as a result of this contract: Provided further. That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful any contract to the contrary notwithstanding. Any person violating any of the provisions of *333 this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
3. The plaintiff is a New York corporation, which, during all times material herein, was wholly owned by an English corporation, Kleinwort Sons and Company, now known as Kleinwort-Benson. Prior to 1948, the plaintiff was engaged entirely in an export-import business. In the forepart of 1948, the plaintiff acquired a controlling interest in the Hill Diesel Engine Corporation of Lansing, Michigan. About a year and a half later, the latter corporation became a wholly owned manufacturing facility of the plaintiff, whose principal office was in New York City. In October 1952, the plaintiff sold its entire interest in the Hill Diesel Engine Corporation and thereafter owned no manufacturing facilities.
4. During World War II, the Army Corps of Engineers began a program of developing and testing snow removal equipment. In 1948-1949, the experience of the Air Force during the Berlin airlift revived interest in the development of equipment and techniques for the rapid removal of snow and ice from airstrips. In 1950, the Chief of Engineers, at the request of the Air Force, assigned a snow removal project to the Engineer Research and Development Laboratories, Fort Belvoir, Virginia. The objective of this project was to develop equipment, either as a single item of equipment or as a family of several items, capable of clearing snow and ice from an airfield runway area 150 feet wide by 5,000 feet long during snowfalls of up to 2 inches per hour. The maximum allowable time for each traverse of the runway during the cleaning operation was given as 2 minutes, keeping the runway operational at all times for emergency purposes, with the entire clearance operation to be completed within 30 minutes.
5. After an initial survey of commercial equipment wherein it was found that equipment then available would not fulfill the project requirements, personnel of the Engineer Research and Development Laboratories contacted representatives of the snow removal industry and discussed the project requirements, and solicited suggestions from those manufacturers *334 who might be capable of producing equipment to meet the requirements.
6. Sometime in May 1951, Mr. Glen Bevan, who according to the plaintiff had 10 years’ prior experience in developing snowplow equipment, and Mr. D. C. Streeter, went to the Engineer Research and Development Laboratories at Fort Belvoir, Virginia (hereinafter referred to as ERDL), and there conferred with the defendant’s project engineer, Mr. Frank M. Austin, and his superior, Mr. Edward C. Xinker, concerning the defendant’s need for high-speed snow removal equipment. Bevan and Streeter were then employed by the plaintiff. Bevan suggested the use of a Curtiss-Wright No. R-3350 aircraft engine as a source of power for turning the rotor on the projected rotary snowplow. Austin and Xinker listed the basic objectives sought to be achieved as indicated in finding 4.
7. As a result of the discussion referred to in the preceding finding, the ERDL, on about May 23,1951, sent a request for proposal to the plaintiff, in the following terms:

Desonption of work or services:

la.. Furnish all engineering, labor, tools, equipment, facilities, materials, supplies and services, for the design, construction, test and preparation for delivery complete and ready to operate, F.o.b., cars, Contractor’s plant, one (1) rotary snowplow, capable of removing, at speeds not less than 30 mph, a path of snow 30 ft. wide by 2 in. deep, weighing 10 lbs per cu ft and discharge same 250 to 750 ft in calm wind and/or 150 to 500 ft against a 20 mph wind. Snowplow shall be capable of displacing 3960 tons of 10 lb snow per hour and shall be capable of removing wind packed snowdrifts 8 ft deep and drifts containing layers of ice. Carrier shall be equipped with a selection of speeds to permit the snowplow to travel at a speed as low as 1.7 mph in order to move into an 8 ft drift uninterruptedly, also at speeds up to 45 mph for travel on highways and accelerate from standstill to 30 mph in 17 seconds.
Operator’s cab shall be weatherproofed, soundproofed insofar as is practicable and shall have unrestricted vision to the front and sides over a minimum arc of 270 degrees. Cab shall be located with relation to the snow *335 plow so that the discharge stream will not obscure vision and shall provide comfortable seating for a minimum of two operators. Unit shall be completely one-man operated with all controls grouped for convenient handling and safe operation.
Snowplow and carrier engines shall be equipped with necessary instrumentation for safe and efficient operation of the snowplow and carrier. All instruments shall he so located as to he readily observed by the operator. Lights for switchboard instruments shall be provided with dimmer control. Illumination for night plowing and warning and safety marker lights shall be provided. Marker lights shall be located on the snowplow so that the unit will be readily visible from any angle both vertically and horizontally. Engines shall be radio suppressed. Ample space shall be provided for installation of two-way radio equipment. Unit shall not exceed 50,000 lbs in weight, and when in transport position, 24 ft. in length, 10 ft. 10 in. in width and 11 ft. 5 in. in height.
Shall be capable of satisfactory performance at any air temperature from rnirnm 65 degrees Fahrenheit to phis 50 degrees Fahrenheit and shall be capable of safe storage at temperatures of minus 80 degrees Fahrenheit for periods of several days at a time and to plus 160 degrees Fahrenheit for short periods of at least four hours daily. Equipment shall be painted in accordance with specification JAN-T-704, Type I, (chrome-yellow).
b. Prior to fabrication of the snowplow, Contractor shall submit for approval one (1) set of preliminary drawings.
c. Contractor shall furnish ample supply of spare parts the cost of which shall not exceed 10 percent of original material cost of Item la.
d. Contractor shall furnish one (1) set of final drawings covering assemblies and sub-assemblies of the complete unit.
e. Contractor shall guarantee the prototype, for a period of 500 hours, from the time of initial operation, against defective workmanship and parts. Any part or parts found to be defective shall be replaced by the Contractor without additional cost to the Government. Any work found to be unsatisfactory shall be rectified at the expense of the Contractor.
*336 8. On June 13, 1951, the plaintiff, by D. C. Streeter of its Snow Plow Division, submitted a proposal, in writing to ERDL, in the following terms:
Following is our proposal to furnish rotary snow plow in accordance with Schedule A, Form 27 (properly processed and attached).
The Drake Dreadnaught Notary Snow Plow, Model 96, will meet or exceed all requirements of Schedule A covered by your project card No. 8-89-03-004, with the following exceptions:
Exception No. 1. The development plow which we propose to furnish will not be equipped to meet the secondary conditions of H, I, J, and that portion of G which pertains to safe storage requirements. However, any of the equipment specified in the above exceptions can be supplied upon specific request, but cost of above has not been included in this estimate.
Exception No. 2. Exception is taken to that part of Schedule A specifying that snow is to be discharged 150 to 500 feet against a 20 mph wind. The consistency and weight of the snow upon leaving the discharge chute is such that, regardless of the efficiency of the rotor and the horsepower used, it is too light and fluffy to carry against wind.
Exception No. 3. The overall transport length of the Drake Dreadnaught is 32 feet, 10 inches, which is well within airborne requirements.
The basic advantage of the Drake Dreadnaught Plow, Model 96, is the use of the special Bevan rotor. This rotor is a modification of that used in the Bevan-Reo Snow Plow development for the Air Force. The Bevan rotor is 96" in diameter, and will produce a tip velocity of 12,000 feet per minute. Appendix I is a photograph of the Bevan rotor as described above. Appendix II is a photograph of the Bevan feeding rotor. Appendix III is artist’s conception of Drake Dreadnaught Rotary Snow Plow, Model 96.
The Drake Dreadnaught Snow Plow, Model 98, is borne on a special truck-type chassis, with specifications as follows:
Wheel base_ 203"

Drive_6x4

Engine_ 280 horsepower Military standard gasoline
Tires_ 1100 x 2214-ply
*337 Cab_Drake Drea&naught special sound-proofed two-man cab
Visibility-cab - 270°
Controls_All controls, snow plow and carrier, centrally located for one-man operation
Acceleration effort_Engine @ 1800 in direct drive=2345.11 feet per min. or 27 MPH
Engine @ 2000 in direct drive=2603 feet per min. or 29.99 MPH
Engine @ 1800 in Low
Low=193.04 ft. per min. or 1.7 MPH
Engine @ 1800 in overdrive=45.43 MPH
Rotor Power_Curtiss-Wrigbt 18 cylinder radial engine, Model 3350 (to be supplied by Government)
Cooling system_ American Blower
General Characteristics
Weight- 49,500 lbs. (dry)
Length- 32 ft. 10 in. (transport position)
Height- 11 ft. 2 in. (transport position)
Width of Rotary Snow Plow without extension blades_ 8'4"
Width of Rotary Snow Plow with extension blades_ 31'
Snow Capacity — 13,200 cu. ft. per minute in 10# new-fallen snow Throw: Inside arc — 300'—zero wind
Outside throw — over 800' — zero wind Dual direction of throw cab-controlled
Plowing Speed — With wings in excess of 30 miles per hour, heavy duty or drift type plowing to height of 8' at reduced speeds
Delivery
_ Time required for contractor to manufacture and deliver f.o.b. Lansing, subject to Government bill of lading — a maximum of 180 days from date of finalization of contract.
We have read and fully understand Engineer Research and Development Proposal Form 27, and will be glad to execute same.
9. In submitting its proposal, the letter quoted in finding 8, the plaintiff attached ERDL Form 27, which showed certain deviations from the description of work or services desired by the defendant. This form is headed “Report of Contract Negotiation,” and was executed on behalf of the plaintiff by D. E. Tiberiis, its vice president, who therein
*338 furnished certain pertinent information requested by the defendant.
As to the deviations, it was indicated that there was to be furnished by the defendant—
One Wright engine 3350-23A
-57
-57A
-57M
-57AM
-26W
A line was drawn through the requirement of discharging snow against a 20 m.p.h. wind, and the length of unit when in transport position was changed from 24 to 60 feet. Two other deviations not material herein were made.
The plaintiff represented that it had qualified engineering, scientific, and other personnel available for the performance of the work and services called for within the time specified. The plaintiff further represented that it intended to subcontract no part of the work. In addition, the plaintiff also represented the following to the defendant:

(5) That it is fully qualified for performing the work wad, services called for by reason of the fact that (state nature of previous performance on similar work or services).
[1]

The snow plow executive personnel have had ten years of experience in developing snow removal equipment. The Hill Diesel Engine Corporation, a wholly owned subsidiary of Drake America Corporation, whose principal business is producing engines, power units, generator sets, pump units, marine engine units for over a period of 50 years, manufactured in excess of 6,000 units for the use of various military and governmental services plus the machining of other articles of armament during World War II.
10. It is not clear in the record as to what took place between June 13 and October 11,1951, in connection with the contract in suit, but on the last mentioned date, the plaintiff, by D. C. Streeter, Snow Plow Division, wrote to the commanding officer, EKDL, Fort Belvoir, in part, as follows:
In reference to paragraph 13 of Form 27 and our answering proposal dated. June 13,1951, we hereby wish to extend the acceptance time to December 15,1951.
*339 11. Proposals had been, submitted by EEDL to five potential suppliers. In response to this inquiry, only two proposals, including plaintiff’s, were submitted.
Sometime prior to October 31,1951, plaintiff’s officers negotiated with ERDL’s contracting personnel regarding the contract price and the form of the contract. A fixed price contract, subject to an upward redetermination of 10 percent, was agreed upon.
12. On October 31, 1951, the commanding officer, EEDL, submitted a letter to the Chief of Engineers, Department of the Army, Washington, D.C., requesting authority to award a contract to the plaintiff, which reads, in pertinent part, as follows:
1. In accordance with ASPE 3-201, a contract has been negotiated and in accordance with APP l-604.5a, authority is requested to award a contract for one experimental model of a truck-mounted rotary snow plow.
2. Pertinent information relative to the proposed contract is furnished as follows:
a. Name and Address of Contractor: Drake America Corporation, 20 East 50th Street, New York 22, New York.
b. Place of Performance: At the contractor’s plant in Lansing, Michigan.
c. Description of Work: Under Project 8-89-03-004 these Laboratories have been directed to develop a rapid means for the removal of snow and ice from airfield runways to keep an airstrip operable and/or prevent more than -2 inches of snow gathering on a 150- by 5000-foot runway, based on 2 inches of snow falling in an hour, and allow planes to land or take off every two minutes. The proposed contract will cover the development and manufacture of one rotary snow plow with production capacity three times present commercial machines and capable of discharging snow at distances three to five times present equipment. This unit will be capable of discharging 3960 tons of snow per hour (based .upon snow weighing 10 pounds per cu ft) and will plow a strip 30 feet wide in 2-inch-deep snow at speeds in excess of 30 mph.
d. Past Performance of the Contractor: During the past war, the Hill Diesel Engine Corporation (a subsidiary of Drake America Corporation) at which plant the snow plow will be fabricated, manufactured a large quantity of electrical generating sets. Since the war *340 the firm has been engaged in the production of diesel engines and electrical generating sets for the Government and commercial markets and have recently gone into commercial production of rotary snow plows.
e. Delivery Schedule: The proposed contractor plans to complete this work within 180 days after award of contract. Based upon past performance of the firm with other Governmental agencies, it can be expected that the snow plow will be delivered in accordance with the proposal. No additional contracts or-extensions are anticipated.
f. Number of Bidders: Proposals were solicited from Wm, Bros Boiler and Manufacturing Company, Sicard Industries, Inc, Klauer Manufacturing Company, and Drake America Corporation. In selecting the proposed contractor, the prices quoted, the exceptions taken to the requirements for the unit, and delivery dates were considered. The Drake America Corporation proposal was the only one agreeing to meet specification requirements. Other manufacturers either did not furnish a proposal or wanted to furnish their commercial machines which are too small to meet project requirements.
g. Type of Contract: A fixed-price supply contract employing Form IV price redetermination downward with upward revision of 10% will be employed for this procurement. A price redetermination downward with an upward revision of 10% is considered justifiable as the item will require new design and development work in order to incorporate new snow removal features.
h. Form of Contract: Form 1529, Contract for lie-search and Development and Technical Service, Modified, will be used for this contract.
i. Amount of Contract: The total dollar value of the proposed contract is a target price of $126,089.26 and a ceiling price of $138,698.19 covering one unit.
‡ ‡ *
k. Basis for Negotiating: Authority to negotiate this proposed contract is contained in ASPE. 3-201. Procurement of the above described equipment by advertising is not feasible because only one mown established firm is capable of manufacturing this high-production, high-speed, rotary snow plow. The equipment is for development and test purposes and the work required involves the coordinated development of a high-speed truck and high-production snow plow. Such work should be performed by a firm having adequate engineering background as well as experience in the development of rotary snow plows. A procurement descrip *341 tion covering tbis item is all tbat can be prepared at this time since the exact means of construction will be determined during the design phase of the unit.
:fi }{; % ifc
13. The Chief of Engineers authorized the award of a contract to the plaintiff.
14. On December 6, 1951, the contracting officer, ERDL, sent the following letter to the plaintiff:
Your proposal dated 13 June 1951, as extended by letter dated 11 October 1951 covering the design, fabrication and delivery of one (1) Rotary Snow Plow in the amount of $126,089.26 providing for a maximum upward revision to $138,698.19 has been accepted.
Contract No. DA-A4 — 009 eng-968 incorporating Form IY Price Redetermination downward with a maximum upward revision not to exceed $138,648.19 [sic] has been assigned to this procurement and will be forwarded to you for execution at an early date.
15. The formal contract, designated as Contract No. DA-44-009 eng-968, was prepared by the contracting officer and sent to the plaintiff on December 19, 1951, for execution by an authorized officer of the plaintiff. The formal contract, executed on behalf of the plaintiff by D. E. Tiberiis, vice president, was returned on January 31, 1952, for execution on behalf of the defendant, and it was thereafter executed by Col. O. B. Beasley, contracting officer, ERDL.
16. The contract contained the following pertinent provisions :
Contract por Research, Development and Technical Services
This contract, entered into this 6th day of December 1951, by the United States oe America, hereinafter called the Government, represented by the Contracting Officer executing this contract, and Drake America Corporation, a corporation organized and existing under the laws of the State of New York of the City of New York, in the State of New York hereinafter called the Contractor, Witnesseth That, the parties hereto do mutually agree as follows:
Article 1. Scope of this Contract. — (a) The Contractor shall furnish and deliver as experimental and/or developmental items for the consideration stated herein the materials, supplies, services, and/or equipment *342 set out in Schedule “A” attached hereto, in strict accordance with the specifications and schedules which are designated and set forth in said Schedule “A” and all of which are made a part hereof:
(b) for the consideration of One Hundred Twenty-Six Thousand Eighty Nine and 26/100 Dollars ($126,089.26), Subject to the provisions of Article 26.
$ * $ $ #
Article 2. Changes. — The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change; provided, however, that the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
Article 3. Extras. — Except as otherwise provided in this contract, no payment for extras shall be made unless such extras and the price therefor have been authorized in writing by the Contracting Officer.
* ❖ iji * ifi
Article 20. Termination for Convenience of the Government. [The usual termination for convenience provision was included.]
‘i» *)•
Article 21. Definitions. — As used throughout this contract, the following terms shall have the meanings set forth below:
*343 (b) The term “Contracting Officer” means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer j and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.
$ ‡ $
Article 26. Price Redetermination.
(a) Because of the nature of the work called for by this contract and the great uncertainty as to the cost of performance hereunder, the parties agree that the contract price fixed in Article 1 hereof may be increased or decreased in accordance with the provision of this Article.
(b) Within thirty (30) days after the completion or termination of this contract, the Contractor will file with the Contracting Officer a statement showing, in such form and detail as the Contracting Officer may prescribe, the Contractor’s cost of producing the supplies or furnishing the services called for hereunder, together with such other information as may be pertinent in the negotiations for a redetermined price pursuant to this article. Such statement of cost shall fairly reflect the normal operation of the Contractor’s cost system. The Contractor will establish and maintain such records of the costs of performing this contract as the Contracting Officer may require in writing. The Contracting Officer shall have the right at all reasonable times to make or cause to be made such examinations and audits of the Contractor’s books, records and accounts as he may request.
(c) Upon the filing of the statement and other pertinent information required by paragraph (b) of this article, the Contractor and the Contracting Officer will promptly negotiate in good faith to agree upon a reasonable redetermined price for the entire contract which, upon the basis of such statement and other pertinent information, will constitute fair and just compensation to the Contractor for the performance of this contract. In determining the extent of any estimated allowance for profit to be taken into account in fixing such redetermined price, consideration will be given to the extent to which the Contractor has performed the contract with efficiency, economy and ingenuity. In no event shall the redetermined price exceed the sum of $138,698.19. The redetermined price shall be evidenced by a supplemental agreement to this contract.
*344 (d) If within sixty (60) days after the completion or termination of this contract, the parties shall fail to agree upon a redetermined price (which term, for the purpose of this article, shall include direct costs, indirect costs and profit) in accordance with the provisions of this article, the failure to agree shall be a dispute concerning a question of fact within the meaning of the article of this contract entitled “Disputes”.
(e) In the event of a price increase the Government will pay or credit to the Contractor the amount by which the redetermined price shall exceed the contract price aforesaid. In the event of a decrease in price the Contractor will repay or credit the amount of such decrease to the Government in such manner as the Contracting Officer may direct.
(f) For any of the purposes of the article of this contract entitled “Termination for Convenience of the Government” (including without limitation, computation of “the total contract price” and “the contract price of work not terminated”), the contract price shall be the redetermined contract price agreed upon under paragraph (c) of this article or determined under paragraph (d) of this article, as the case may be.
# % % & %
Article 28. Government-Furnished Property, (a) The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the property which the schedule or the specifications state the Government will furnish (hereinafter referred to as “Government-Furnished property”). The delivery or performance dates for the supplies or services to be furnished by the Contractor under this contract are based upon the expectation that Government-Furnished property of a type suitable for use will be delivered to the Contractor at the times stated in the schedule or if not so stated in sufficient time to enable the Contractor to meet such delivery or performance dates. In the event that Government-Furnished property is not delivered to the Contractor by such time or times, the Contracting Officer shall, if requested by the Contractor, make a determination of the delay occasioned the Contractor thereby, and shall grant to the Contractor a reasonable extension of time in respect of such delivery or performance dates. The Government shall not be liable to the Contractor for damages or loss of profit by reason of any delay in delivery of or failure to deliver any or all of the Government-Furnished prop *345 erty, except that in case of such delay or failure, upon the written request of the Contractor, an equitable adjustment shall be made in the delivery or performance dates, or price, or both, and in any other contractural provision affected thereby, in accordance with the procedures provided for in the article of this contract entitled “Changes”.
17. Schedule “A” of the contract, in pertinent part, provided:
This Schedule “A” is attached to and made a part of the above numbered contract. In accordance with the terms and conditions thereof, the Contractor will furnish the following:
Item: Descriptiok op Work ANd/or Services
No. Amount
1 (a) All engineering, labor, tools, equipment, supplies, materials and services (except such items to be furnished by the Government as hereinafter provided for), necessary to design, construct, test and deliver; and design, construct, test and deliver, complete and ready to operate, One (1) Notary Snowplow meeting the following characteristics and specifications:
(1) Unit shall be capable of removing, at speeds not less than 30 mph, a path of snow 30 ft. wide by 2 in. deep, weighing 10 lbs per cu. ft. and discharge 90% of same between 250 to 750 ft. from the unit with the (but not into) wind not exceeding 5 mph.
(2) Unit shall be capable of displacing 3960 tons of 10 lb. per cu. ft. of snow per hour and shall be capable of removing wind packed snowdrifts 8 ft. deep and 8 ft. wide and drifts containing 3 or 4 layers of ice of 2 in. maximum thickness.
(3) The carrier shall be equipped with a selection of speeds to permit the snowplow to travel uninterruptedly into a snow drift described in (2) above, also at speeds up to 45 mph for travel on highways (not plowing) and accelerate from standstill to 30 mph in 17 seconds in 2" deep snow plowing a path 30 feet wide.
*346 (8) Unit shall not exceed 50,000 lbs. in weight, and when in transport position, 60 ft. in length, 10 ft. 10 inches in width and 11 ft. 5 inches in height. Tires shall be 1200 x 20 size and wheels shall conform to Ordnance Drawing D7353294.
(b) Prior to fabrication of (a) above, Contractor shall prepare and submit to the Government, for approval of the Contracting Officer, One (1) complete set of preliminary drawings of the unit to be fabricated.
(c) Upon receipt by the Contractor of Contracting Officer’s approval of the preliminary drawings to be furnished under (b) above, Contractor shall make any changes or modifications in said drawings as may be indicated by such approval and proceed to fabricate the equipment in accordance therewith and as provided for in (a) above.
# * * Hi *
Generar Provisions
(1) The Government shall deliver to the Contractor, f.o.b. Cars, Lansing, Michigan, for incorporation in and to become an integral component of the end item to be received under this contract, One (1) Wright Engine 3350-57, together with necessary engine accessories. * * *
Hs # & Hi s£
18. The defendant’s principal witness, Edward C. Kinker, conceded that the specifications included in the contract in suit were incapable of compliance by anyone. This is supported by the testimony of the plaintiff’s witness, Austin, who had been the defendant’s project engineer, Kinker’s subordinate. The contract must be found, therefore, to be impossible of performance.
19. The plaintiff exerted its best efforts in an attempt to meet the specifications but was not successful. For this effort, the plaintiff was paid $138,698.19, but it had expended this sum plus an additional amount of at least $140,759.29.
20. There is no evidence as to whether or not the plaintiff complied with the requirements of the specifications as to the *347 f urnishing to the contracting officer of one complete set of preliminary drawings of the nnit, prior to the fabrication of the nnit by the plaintiff. On February 5,1952, however, the plaintiff was requested to furnish such preliminary drawings.
21. The defendant sent the Curtiss-Wright Engine No. 0200-D3350-57AM to the plaintiff at 238 Mill Street, Lansing, Michigan, via commercial air line. It was received on January 7,1952.
22. On December 19,1951, the EDDL’s contracting officer sent the following letter to the plaintiff:
Deference: Appointment of Mr. Austin, Special Equip. Br. Project Engineer as Contracting Officer’s representative.
In connection with the performance of your contract, the above named Project Engineer, Engineer Desearch and Development Laboratories, has been assigned as Contracting Officer’s representative. Shortly after the receipt by you of your contract the Project Engineer will contact you to determine any obstacles to the satisfactory completion of the contract.
It will be the responsibility of the Project Engineer as Contracting Officer’s representative to:
a. Assist the Contracting Officer in complete supervision of the contract, short of modifying the terms and conditions of the contract.
b. Perform liaison between the Contractor and the Contracting Officer.
c. Dender assistance to the Contractor in discharging his contractual responsibilities. Such assistance may include:
1. Obtaining machine tools, equipment, materials in short supply, etc.
2. Performance of expediting services, when necessary.
3. Direct inspection of the items involved.
4. Arrangements for and supervision of all tests required by and in accord with the terms of the contract.
It is requested that you utilize the services of the Project Engineer to the fullest extent possible in order to expedite and facilitate completion of the work in accordance with all of the terms and conditions of the contract.
The Project Engineer has no authority to modify the stated terms of the contract or specifications nor to ap *348 prove any action which will result in additional charges to the Government. All such changes must be approved in writing by the Contracting Officer. However, any desired changes in the contract or specifications should be discussed with the Project Engineer prior to submission of a request for change to the Contracting Officer.
23. Fabrication of some of the components of the snowplow were begun by the plaintiff at the plant of Hill Diesel Engine Corporation at Lansing, Michigan. The work was supervised by Mr. Glen Bevan. By February 5, 1952, the work had progressed, as reported by Mr. Edward Kinker, in the following terms:
Contractor has received carrier chassis, snow plow engine, blower and blower engine for cooling snow plow engine, gathering wings and dollies, steel and aluminum for frame and snow plow engine house, bearings, hydraulic cylinders and chain lubricator. Contractor anticipates receiving by 11 February. 52 operator’s cab, plow casing and rotor and hydraulic controls. Frame on which snow plow and its engine, cooling system and cab will be mounted, has been fabricated and mounted on carrier chassis. Contractor anticipates unit will be completed 25 February 52.
Contractor is expediting construction of rotary snow plow so that it will be available for tests this winter.
24. Snow was needed for the testing of the snowplow. Someone determined (though the factors entering into the determination are not shown) that an unused National Guard airport at Grayling, Michigan, would be a suitable place for the plaintiff to conduct performance tests of the plow. Arrangements were made by the defendant for its use as a testing place. In early March 1952, the snowplow had been fabricated to the extent that Mr. Bevan concluded it was ready for “shakedown” trials at Grayling, Michigan. Accordingly, the plaintiff had it driven, under its own power, 160 miles from Lansing to Grayling. After the initial shakedown run was concluded, the plow was returned to Lansing for certain modifications and final assembly.
Mr. Frank Austin, project engineer, on or about March 16, 1952, in a trip and conference report to his superiors at EEDL, accurately relating the progress of the work on the plow, stated, in part, as follows:
*349 Discussion: Notary snow plow, was driven from Lansing to Grayling, Michigan, a distance of 160 miles, for shakedown run. Unit was driven at speeds up. to 30 mph and handled satisfactorily. The plow without wings was operated in snow 17 to 23 inches deep weighing approximately 30 lb per cu ft to determine whether any modification and/or adjustments were necessary prior to finalizing fabrication and making extensive shakedown tests. Although no actual production tests were made it was observed that snow was discharged approximately 800 feet on the outer arc. Initial shakedown run revealed that an electric starter equipped with a clutch, should be provided on the rotary engine (Wright) to augment the inertia starter for clearing the cylinders prior to starting and an air fuel ratio gauge should be installed to indicate when adjustments should be made for proper fuel mixture and the prevention of excessive head temperatures. Plow was returned to manufacturer’s plant for modification and final assembly. It is anticipated that modification and final assembly will be completed by 22 March 52 after which factory shakedown operations will be resumed. When the contractor is satisfied that the plow is functioning properly, Government officials will be called in to observe snow plow tests. Weather Bureau Records indicate snow usually falls thru the month of April and that residual snow is available until early May in the area in which the shakedown tests are to be conducted.
Conclusions Drawn: Drake America rotary snow plow will be available for tests during month of April 52.
Action Taken: Assisted Drake America Corporation in securing electrical starting equipment for rotary snow plow engine from Selfridge Air Force Base.
25. During the last days of March and the first days of April 1952, in a further test of the snowplow, the rotor failed in that at higher speeds of rotation, the blades stretched or elongated, striking the snow collection chamber, and breaking the blades and blade welds. This necessitated redesign of the rotor and the replacement of all blades. Work on the plow continued during the summer of 1952.
26. As initially constructed, the plow and its associated carrier appeared as follows:
The front end of the plow consisted of a multi-bladed rotor, 8 feet in diameter, vertically mounted and revolving *350 within a rotor case; behind this, the rotor shaft was connected and geared to the main shaft of the aircraft engine by a series of chains and sprockets. This arrangement supplied the motive power for the rotor.
All of the foregoing was mounted upon a frame of steel girders, which, in turn, was mounted upon the carrier vehicle. The carrier vehicle was a large 6-wheeled truck chassis turned backwards (with the truck engine and steering gear in the rear; the fixed dual tandem wheels in the front). The operator’s cab for the vehicle was located above the rotor case and the carrier was steered by hydraulic controls to the steering gear on the rear of the vehicle.
The rotor case contained openings on either side for the discharge of snow, which openings could be opened or closed to control the direction of the snow discharge. A separate blower and blower engine for cooling the aircraft engine were also mounted on the unit.
27. In October 1952, the Drake America Corporation sold its interest in the Hill Diesel Engine Corporation to a Mr. Melvin T. Berry. From that time on, the plaintiff company had no directly owned manufacturing facilities. However, the new purchaser of the Hill Diesel Engine Corporation permitted plaintiff to stay on at the plant for some time.
28. Later in 1952, the unit was moved back to the airport at Grayling for further testing. On December 3,1952, testing was resumed, and after several runs, engine heating resulted in the discovery that some cooling duct work had vibrated loose. During the tests, the plow discharged snow at the rate of 4,260 tons per hour. Snow of a density of 19% lbs. per cu. ft. was discharged a distance of 415 feet. After making the repairs to the duct work, tests were delayed awaiting greater snowfall. During this time a governor was installed upon the aircraft engine to protect it from over-speeding.
29. Acceptance tests on the plow were conducted at the airport at Grayling during the period January 13-23, 1953. Mr. Austin’s trip report on such tests reads, in part, as follows:
* * *. (b) Acceptance tests on Drake America High Production Botary Snow Plow were continued. Sweep *351 ing runs on runways were made and windrows on taxi ways were plowed. Snow varied in weight from 15 lbs to 40 lbs. A runway — 6300 ft by 145 ft was cleared of 4-inch-15 lb snow in approximately 26 minutes, discharging snow at an approximate rate of 5300 tons per hour at a distance of 560 feet. Speeds of up to 23 miles per hour were obtained in this plowing operation.
In windrow plowing, 40 lb snow was handled for an interval of 20 minutes at the rate of approximately 7300 tons per hour, discharging snow up to 630 feet. A total plowing time of 6 hours and 24 minutes was obtained from Jan 13th through 23rd of Jan. The plow was deadlined [meaning inoperative] for 3% days of this time due to clutch trouble on carrier and trouble with aircraft engine cooling blower. Warm weather & rain delayed operations for 2 days. Snow fell on 7 out of the 11 days and plowing operations were limited to approximately 1 hour per day due to the large volume of snow handled while plow was operating. Clear weather, freshly plowed runways, and no weather forecast indicating snow in the immediate future caused tests to be suspended pending heavy and continued snow fall.
30. Because the snow season ended fairly early in 1953, testing of the plow at Grayling was impeded. It was demonstrated by March 25, 1953, however, that the unit was overweight by some 20,000-29,000 pounds. It was found impossible to shift gears on the carrier (propulsion part of the plow) under load, while maintaining motion, due to resistance of snow load and weight of the entire unit. The use of a torque converter or fluid coupling with an automatic transmission on the carrier was indicated to avoid the necessity of shifting gears.
31. Because there was no building at Grayling which the plaintiff could use for effecting work operations on the plow, it was necessary for the plaintiff to construct a temporary structure there for this purpose and this was done.
32. On May 1, 1953, the plaintiff’s president sent a letter to the contracting officer, ERDL, Fort Belvoir, Virginia, reading as follows:
Referring to the above mentioned contract [Contract No. DA-44 — 009 Eng.-968, Project No. 8-89-03-004], we should like to submit for your consideration the follow *352 ing proposal, which, would materially benefit the purpose of the project under which we are engaged, which proposal is made as the result of conferences held with members of the staff of the Special Equipment Branch of the Engineer Research & Development Laboratories.
The two deficiencies that developed during the acceptance tests of the Hi Production Rotary Snow Plow designed and constructed under the above mentioned contract were its overweight and the inability of the carrier to meet the speed requirements while plowing.
We have, after considerable research and discussions, come to the conclusion that in order to correct these deficiencies and for the plow to serve the maximum purpose of the Government’s project, it would be advisable to redesign and change the proposed unit in the following respects:
(a) Remove all surplus weight by frame and structure reworking.
(b) Change snow plow engine installation and reworking cooling system.
(c) Reduce rotor from 8 feet to 6 feet and reducing drive line size. (The unit will still meet performance requirements with this change.)
(d) Modify carrier by installation of different car-buretion and carrier control.
It should be noted that since the contract for this carrier was issued to us, the Corps of Engineers have recognized that a conventionally geared and controlled carrier would be unlikely to meet the speed and plowing requirements of the Government as now set forth. We, therefore, suggest that in addition to the above modifications, the carrier on which the plow is mounted be modified to include a torque converter and torquematic transmission. With these changes made, it is the considered opinion of our engineers, as well as those of your staff, that the plow would operate more efficiently and better serve the purpose of the Government’s project program.
We are prepared to make certain modifications at our own expense and believe it would be to the best interest of the Government and ourselves if the modifications suggested as a result of the meetings were effected at the same time. We are prepared to make all of the modifications as above stated for an additional sum of $35,000.
We would suggest that since it is the desire of our respective engineering staffs to continue the plow tests at the first available date, we be given your authorization to proceed with these modifications at the earliest possible date.
*353 33. There is no reply to the above-quoted letter in evidence in this case. However, four officials of ERDL went to New York in early June 1953 to discuss this problem. They were Mr. Cooney of the Purchasing and Contracting Branch, Mr. Austin, the project engineer, Mr. Kinker, Chief of the Special Equipment Branch, and a Mr. Wilson. These men conferred with Mr. Johnstone, the plaintiff’s president, Mr. Ellis, an attorney, and Mr. Bevan. For the reasons stated in plaintiff’s letter of May 1, 1953, plaintiff’s representatives requested a contract amendment which would increase the contract price by $35,000. Plaintiff’s request was supported by Mr. Austin and Mr. Kinker. However, plaintiff was informed that the defendant had determined that the proposed modifications in the snowplow were within the scope of the contract and that the request for the price increase would not be approved. It was agreed that the plaintiff would submit for the contracting officer’s approval a drawing indicating design changes to be made to enable the rotary snowplow to meet the weight and acceleration characteristics required by the terms of the contract. There was some discussion about the possibility of the Government’s terminating the contract.
34. On June 25, 1953, the plaintiff’s president, Johnstone, asked Mr. Cooney for a week’s delay before the defendant took any action concerning the possible default of the contract. Johnstone indicated that a director of the plaintiff’s firm was coming from London with full authority to determine a course of action for the plaintiff.
35. A second conference was held at ERDL, Fort Belvoir, Virginia, on July 2, 1953, between representatives of defendant and plaintiff, including John Briggs, one of plaintiff’s directors who had been sent from London by Kleinwort Sons and Company, which wholly owned plaintiff, with full authority to determine a course of action for plaintiff. Plaintiff’s plans for subcontracting the work of modifying the snowplow to the American Bantam Car Company were discussed. Plaintiff’s representatives were again told that the Government considered that the contract was a fixed-price contract and that the contract price would not be increased *354 to cover the cost of changing the unit to meet the specifications. However, plaintiff’s representatives were advised that they conld nse any means at their disposal for meeting the contract requirements.
36. On July 8, 1953, the plaintiff, by Mr. Johnstone, sent the following letter to the contracting officer, EKDL:
We refer to the various conferences concerning the subject contract. In the first place DAC must reiterate that they have always viewed this contract as a true Research and Development Contract in accord with its title, as in fact any contract must surely be when a new and untried piece of equipment is concerned. We further maintain that on this understanding we have striven to meet the Government’s requirements insofar as they are attainable. We consider that any other interpretation of this contract would impose at this stage an unreasonable burden on a contractor who has used his best efforts in good faith.
It is, however, our wish to provide the Government with the equipment it requires. In the light of your views, given at the conference on July 2nd at Fort Bel-voir, and your confidence then expressed that the snow plow could in fact be modified so as to become acceptable we are, therefore, prepared to arrange for further modification of the equipment in an earnest attempt to achieve this object. To this end we are taking immediate steps to arrange for an independent consulting engineer to work out, in conjunction with the American Bantam Car Co. and Mr. Bevan, the details of such modifications as are consistent with sound engineering practice. We would appreciate your confirmation that you are prepared to give us the necessary extension in time under the contract to permit this work to be done, and would ask you kindly to send any further communications, verbal or otherwise, to me personally or to my authorized representative, Mr. John Briggs, here in New York.
We conclude by expressing our appreciation of the courtesy shown to us by you during our recent conferences and we trust that our efforts will succeed in producing a snow plow which will be acceptable.
37. On or before July 14, 1953, Mr. John Briggs, apparently the plaintiff’s director from London, referred to earlier, talked with Mr. Austin. On July 14, 1953, Mr. Cooney re *355 ceived a written memorandum from Mr. Austin, stating that Mr. Briggs understood that no modifications would be made in the contract except to extend the time for the delivery of the completed snowplow. The plaintiff advised that it would ship the snowplow from Grayling, Michigan, to Butler, Pennsylvania, within the next few days following July 14, 1953.
38. On July 14, 1953, the plaintiff entered into a subcontract with American Bantam Car Company, Butler, Pennsylvania (sometimes hereinafter referred to as American Bantam or Bantam), by the terms of which the latter firm was to perform all the labor, furnish all material and equipment for and was to modify the snowplow in the following particulars:
APPENDIX A
MODIFICATIONS TO PLOW
1. Strip vehicle to chassis and determine weight.
2. Bemove existing transmission, clutch and reversing gear box.
3. Install Spicer, Brown-Lipe transmission with Twin-Disc torque converter, reversing gear box and clutch. Install torque converter cooling system as recommended by Hall-Scott, Twin-Disc, and Spicer Companies to meet necessary acceleration and speed specifications.
4. Analyze sub frame for strength and weight with objective of removing excess weight.
5. Place sub frame in position on chassis.
6. Determine weight of superstructure. Bemove excess weight based upon engineering study of design, so that dry weight of machine without cab and blades and blade supports and other equipment or parts which can be detached or attached without special tools within period of six hours shall not exceed 55,000 lbs.
7. Be-install superstructure.
8. Determine vehicle center of gravity and re-position radial engine to shift vehicle center of gravity toward the rear wheels. Add new axial cooling fan and associated engine cowling and duct work.
9. Belocate snow rotor gear train, shafting and bearing blocks to conform to new position of radial engine.
10.Fabricate and install new 6 ft. diameter snow rotor and housing.
*356 11. Install new aluminum panels to sides and top of vehicle superstructure.
12. Fabricate and install new 300 gallon gasoline tank for radial engine.
The subcontract between the plaintiff and American Bantam Car Company provided, in part, as follows:
Article III — CONSIDERATION
As consideration for the work to be performed hereunder Drake shall pay Bantam upon delivery of the plow the actual cost to Bantam plus 10% but not more than:
1. Cost of materials used in modification at their net cost to Bantam plus
2. 5% of (1) for freight and handling plus
3. Direct labor cost plus
4. 100% of (3) plus
5. G & A at 5% of the total of (1-4) inclusive plus
6. Direct cost of engineering plus
1. 5% of (6) plus
8. Profit equal to 10% of (1-1) inclusive.
Article IV — Cost
It is presently estimated that the total cost of the work to be performed hereunder will be approximately $40,000.
39. The plaintiff had entered into a purchase order contract with an engineering firm sometime prior to the date of the American Bantam subcontract.
The advice of this engineering firm (Vitro Corporation of America) formed the basis of the scope of the subcontract between the plaintiff and American Bantam.
40. American Bantam proceeded to do the work covered by the subcontract at its plant at Butler, Pennsylvania.
41. There is testimony in the record that the plaintiff, through its subcontractor, American Bantam, also performed some additional work over and above the requirements of the contract in suit, but the testimony does not comport with the evidence of record. It is difficult to believe that not only one but two firms would spend large sums of money to do work for which neither had a written authorization in hand. Neither the plaintiff nor its subcontractor had any written order as to work required beyond the terms of the original *357 contract. No change in the specifications in the prime contract between plaintiff and defendant were ever made.
42. In December 1953, the snowplow was taken from Butler, Pennsylvania, to the test site at Grayling, Michigan, for performance tests.
43. In the latter part of January 1954, after a snowfall at Grayling, the plow was again tested and this time the rotor buckets failed. After repair of the rotor buckets, the testing continued. On the morning of February 2, 1954, while the plow was being driven by the plaintiff’s employees in a test run, a fire broke out in the Wright R-3350 aircraft engine. The plow was halted immediately and the fire extinguished after a brief interval. Upon a subsequent investigation by the defendant, it was determined that the “damage by fire to the Government furnished Wright Engine was not due to the willful misconduct or lack of good faith of any of the contractor’s managerial personnel as defined in the basic contract.”
44. It appears that at the time of the fire, Mr. Bevan, who had been in charge of the work during the entire period of performance for the plaintiff, was then an employee of American Bantam.
45. The fire-damaged engine was removed from the snowplow, laid aside, and replaced with another Wright aircraft engine which was furnished by the defendant shortly thereafter. By February 22, 1954, the new engine had been installed and the plow was again making test runs. On the second run, the snow feeders failed structurally.
46. On or about March 17, 1954, another test session was under way. At this time, the plaintiff’s operator drove the plow into a snow windrow, whereupon two shafts, one connecting the aircraft engine and the No. 1 chain reduction drive and the other connecting the No. 1 and No. 2 chain reduction drives, broke. The snowplow was then moved to Bay City, Michigan, to the plant of the Industrial Brown-hoist Corporation, which repaired the broken shafts and other damaged components. On or about April 30,1954, the plow was returned to Grayling, Michigan, from Bay City, Michigan. However, no further testing of the snowplow took place inasmuch as the snow season had ended.
*358 47. At the close of the snow season the snowplow still had not met the requirements of the specifications. At a meeting held on or about May 13,1954, the plaintiff made known its desire to discontinue the project and to be relieved of further efforts under the contract. The defendant’s representatives informed plaintiff of the possibility of terminating the contract under the termination for the convenience of the Government clause and suggested that the plaintiff set forth its request in writing. As a result thereof, the plaintiff, under date of May 13, 1954, wrote the commanding officer, ERDL, as follows:
Re: Contract DA l¡.I¡.-009/ENG/968
We refer to the conversation held today between Mr. Howard Wilson and Mr. Frank Austin, of the Corps of Engineers on one hand, and Mr. Ivo M. L. D. Forde, Colonel C. J. P. Hudson and Mr. Harvey Klein of Drake America Corporation on the other hand. We pointed out that insofar as the snow plow, (which is the subject of the above mentioned contract), is concerned, we have used our very best efforts to make this a success, and we have spent a great deal of money over and above the contract price in trying to produce a plow which was one hundred percent satisfactory. For these reasons we confirm that we should, for our part, like to have this contract closed out by termination. In the event of the Government agreeing to this suggestion we hope it would be possible, at this present juncture, to pay us the balance still due under the terms of the contract.
48. Thereafter, by formal notice dated October 21, 1954, the contract was terminated for the convenience of the Government. Under date of December 8,1954, the plaintiff submitted its termination claim showing total expenditures under the contract in the amount of $296,112.14, which amount was amended by letter of February 28,1955, to $324,-695.24. Upon audit of the plaintiff’s records, it was ascertained that the plaintiff had expended more than the maximum possible contract compensation; accordingly, no attempt was made to develop an exact audit beyond this amount.
49. Subsequently, the plaintiff and the defendant, after negotiation, reached an agreed settlement of the plaintiff’s termination claim in which the plaintiff would receive the *359 maximum total contract consideration of $138,698.19. The defendant’s negotiator’s report, dated November 9, 1955, contained tbe following pertinent statement:
* * * It was noted tliat the contractor designed, redesigned, fabricated and refabricated the unit several times without regard to costs after he had already exceeded his contract consideration on the first attempt. The failure to complete the contract is basically due to Government requirements that the “state of the art” will not permit with existing equipment as required to be used, at this time. The contractor has shown his willingness and desirability to perform the contract up to the date of termination. It is impossible to establish a true percentage of completion of the item. As stated above it was completely fabricated several times, however, would not meet the performance requirements of the contract. It is on this basis that the recommendation for payment of the total contract consideration be made to the contractor. This amount of $138,698.19 however, does not include any profit. * * *
50. Under date of November 25,1955, the plaintiff and the defendant entered into a final supplemental agreement to the contract, the pertinent provisions of which are set forth below:
Whereas, On the 6th day of December 1951, the parties hereto entered into Contract No. DA-44-009 ENG-968, for the Design Construction and Test of a Notary Snow Plow; and
Whereas, the “Termination for Convenience of the Government” clause of the contract provides that the performance of work under the contract may at the option of the Government be terminated by the Government in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government, and that the Contractor and the Contracting Officer may agree upon the whole or any part of the amount to be paid to the Contractor by reason of such termination; and
Whereas, by notice of termination dated 21 October 1954 the Government advised the Contractor of the termination of the contract for the convenience of the Government as of the date and to the extent provided in such Notice; and
*360 Now, therefore, the parties hereto do mutually agree as follows:
*1» si* »!»
Article 4. That, based on review of Contractor’s statement of cost, report of audit, contract performance, terms and conditions of the contract, and negotiations with the contractor, by mutual agreement, the final terminated contract determination is $138,698.19.
Article 5. This Supplemental Agreement provides for the complete termination of the contract and release of all rights and liabilities thereunder.
Now, therefore, The said contract is hereby modified in the following particulars, but in no others:
Sub-paragraph (b) of Article-1 is deleted in its entirety and the following substituted therefor:
“ (b) For the consideration of ONE Hundred Thirty-Eight Thousand Six Hundred Ninety-Eight and 19/100 Dollars ($138,698.19)”.
* * * *
51. During performance of the contract, the plaintiff had been paid partial payments totaling $108,864.93. Upon execution of the final supplemental agreement, referred to above, and submission of an invoice to the defendant, the plaintiff was paid $29,833.26, making a total payment of $138,698.19.
52. Upon receipt of the check, the plaintiff, by its controller, sent the following letter to the commanding officer, EBDL:
We are pleased to acknowledge receipt of your check in the amount of $29,833.26 representing payment relating to subject contract.
This letter is being written in order that we might personally thank you for all your very kind courtesy and guidance in closing out this contract. It is indeed a pleasure to have worked with you, Mr. Tschopp, Mr. Cooney, and all of the other very fine people with whom we had contact in your office. The closing out of this contract was not an easy matter, and we feel we were fortunate in being able to call upon you to guide us in the preparation and completion of the very many forms involved.
Once again, thank you for all your kind help.
53. The plaintiff spent at least $140,159.29 over and above the amount received from the defendant in the performance of work in building the snowplow under the contract in suit. *361 As a result of the fire in the aircraft engine, the plaintiff was paid $5,000 by an insurance company. There is included in the $140,759.29 figure an amount totaling $32,552.01, which represents expenses incurred and paid by the plaintiff in performing work under the contract after the fire on February 2, 1954. Plaintiff claims that it incurred additional expenses for the following items:
Governor _$10,576. 85
Construction of depot (hangar)_ 7,405.00
Obtaining accessories_ 1,772.38
Changes over and above contract requirements - 70,000.00-80,000.00
Expense after fire_ 35, 552.01
Each of the items claimed consist of estimated costs which cannot be verified by an audit.
Plaintiff has been unable to locate the cost records of Hill Diesel Engine Company. Most of the cost records of the American Bantam Car Company, including those related to its subcontract with plaintiff, were destroyed sometime after the completion of the subcontract. Of the expenses incurred by plaintiff in performing the contract work after the fire, the evidence does not show how much was attributable to the fire and how much was due to other causes.
54. Mr. Bevan was not a regular employee of plaintiff but was specially employed for the snowplow project. His contract of employment provided that he was to participate hi any profits realized from subsequent sales of the plow if it should be successfully developed. He was the principal source of plaintiff’s expertise in the snow removal area and was in charge of most of plaintiff’s operations under the contract.
55. Plaintiff entered into the contract in anticipation of making a substantial profit in selling the plow for both commercial and Government use.
56. During the performance of the contract, plaintiff was represented by its own attorney, who advised plaintiff to execute the supplemental agreement which released defendant from all liability under the contract. The release contained no reservations or exceptions for additional claims asserted by plaintiff.
*362 57. Plaintiff's officers understood that all contract amendments or changes had to be authorized in writing by the contracting officer. They also knew that neither Mr. Austin, the project engineer, nor any other member of the engineering personnel had authority to modify the contract or to approve any action which would result in additional charges to the Government. The evidence does not establish that any representatives of the Government promised plaintiff that it would be reimbursed for any expenses incurred in excess of the contract price.
58. It is impossible to estimate the value of the information the Government obtained from plaintiff’s attempt to perform the contract. After observing the test runs of plaintiff’s plow, another Government snowplow contractor made some changes in his unit which increased the rate at which snow could be removed and the distance at which it could be discharged from the plow. Defendant also learned that a carrier vehicle of the size and weight designed by plaintiff, together with certain other features in plaintiff’s plow, should not be incorporated in large plows for removing snow from airfield runways. The work on the contract demonstrated to the Government that the art of snow removal was not sufficiently advanced at that time to accomplish the objectives of the Air Force.
59. The plaintiff, in sustaining the loss referred to above, had begun an ambitious undertaking which was found to be not only beyond its abilities, but also beyond the abilities of anyone else. It was, therefore, found to be impossible of performance. No fault or negligence was attributable to the plaintiff in the performance of the work. On the other hand, it has been shown that the plaintiff put forth its best efforts, though at a great financial loss.

 Since most of the evidence in this case was heard before the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), we think it proper to file this report without reference to the Supreme Court’s opinions in that case. Consequently, defendant’s belated suggestion of lack of jurisdiction to entertain congressional references is rejected.

 In Hellander v. United States, 147 Ct. Cl. 550, 561, 178 F. Supp. 932, (1959), It was held that when a contractor signs a release without exceptions, the united States is discharged from all claims in law and equity arising out of the contract.

 The facts In this case are unlike those in Palmer-Bee Co. v. United States, 142 Ct. Cl. 485 (1958). There the contractor’s persistent efforts and considerable expenditures in excess of the contract price resulted in the pro- *332 auction of a successful radar antenna unit, which -was of great value to the Navy. National Presto Industries, Inc. v. United States, 167 Ct. Cl. 749, 338 F. 2d 99 (1964), is also dissimilar in several significant respects. There, the defendant received the shells it had ordered, as well as the additional benefit of learning that the new shell-making process required turning equipment; in the present case, the Government never received the snow plow it wanted and has already paid, in our view, for the benefits accruing from the plaintiff’s unsuccessful efforts. In National Presto, the court found that the risk of the mistake as to the turning equipment did not rest on the contractor, in view (inter alia) of the contractor’s relative inexpertise, the untried character of the new process, and the requirement that that particular process be used in making these shells. Here, on the other hand, the method of performance was left wholly to the contractor which (through Bevan) had considerable expertise on which the Government relied heavily. Finally, in the present case we have a definite refusal by the defendant to incur any costs over the contract maximum, coupled with a clear indication to plaintiff that further work would be wholly on its own; in National Presto, the defendant’s representatives contemplated, and implicitly encouraged, the continued testing and experimentation.

 The part shown in italics was contained in ERDL Form 27.