**Eugene C. OTTINGER and Clyde L. Ot-
tinger, a Copartnership doing busi-
ness as Ottinger Brothers,**

v.

**The UNITED STATES.**

No. Cong. 13–56.

United States Court of Claims.

April 4, 1962.

James Perkins Parker, Washington, D. C., for plaintiffs.

Mary K. Fagan, Washington, D. C., with whom was Asst. Atty. Gen., William H. Orrick, Jr., for defendant.

DURFEE, Judge.

In this proceeding plaintiffs seek to recover losses incurred in the performance of four government construction contracts during 1943 and 1944, which losses allegedly resulted directly from wrongful action and inaction by certain government officials. More specifically the losses are alleged to have resulted from wrongful failure of the Tulsa office of the United States Employment Service to refer skilled labor to plaintiffs for work on their construction projects under the four contracts.

This matter has been presented for our consideration in a previous proceeding in which we concluded, after thorough consideration of the facts and arguments, that plaintiffs were not legally entitled to recover. Ottinger Brothers v. United States, 106 F.Supp. 198, 123 Ct. Cl. 23 (1952). The basis of that decision was that labor was not referred to plaintiffs for work on their projects pursuant to a uniformly applied policy of national interest, which was neither arbitrary nor unreasonable in any manner that would remove it from the realm of sovereign acts which would not consti-

tute breaches of implied terms in contracts of the United States. Plaintiffs' motion for reconsideration was subsequently denied.

On March 31, 1955 a bill was introduced in the House of Representatives (H.R. 5461), to "confer authority on the Secretary of the Army to pay certain claims of the Ottinger Brothers." On July 3, 1956 the House of Representatives adopted a resolution (H.Res. 531) which read in part as follows:

"*Resolved*, That the bill (H.R. 5461) entitled 'A bill to confer authority upon the Secretary of the Army to pay certain claims of Ottinger Brothers,' together with the accompanying papers, notwithstanding the statute of limitations, be referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House of Representatives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant."

It is on the basis of a petition filed pursuant to the above resolution that this case was tried and is presently before us.

Plaintiffs are brothers who during the period 1940–1945 were, in partnership, engaged in operating a general construction business. During this period the major portion of their work related to construction for agencies of the United States. In this proceeding we are concerned with work on four contracts which plaintiffs entered with the Corps of Engineers for construction pursuant to a flood control project near Tulsa, Oklahoma. The contracts were dated September 22 and December 6, 1943, and January 3 and February 29, 1944.

During the period with which we are presently concerned the nation was at war, the supply of labor was diminished, and the demands being placed upon the available labor supply by mobilization of our industrial plant and economy for the military effort were enormous. The War Manpower Commission had been created in 1942 to plan and establish policies for the most effective mobilization and utilization of the nation's available manpower for the prosecution of the war, and the United States Employment Service (hereinafter USES), which had been created in 1933 (48 Stat. 113, 29 U.S.C.A. § 49 et seq.) was placed within the orbit of responsibility of the Commission. Regional Directors were appointed by the War Manpower Commission, each of whom was responsible for the management and field operation of the manpower program in his own region, inclr `ng the local offices of the USES. Each Regional Director was afforded the advice of a regional Management-Labor Committee, which was, as the name would indicate, composed of members of industry and labor active in the region.

The USES historically followed a policy of complete neutrality regarding labor disputes. Thus, upon filing of a notice of the existence of a labor dispute by a union, the local USES office would, pursuant to a uniform policy, cease referrals of labor to the employer involved. Plaintiffs were aware of this policy prior to their bidding on the contracts now before us. During August 1943, while plaintiffs were engaged in another government contract construction project in the area, several unions filed with the Tulsa office of the USES notices of the existence of a dispute with plaintiffs on the project, and thereafter the USES ceased further referrals of labor. The basis of the dispute lay in the fact that labor in the area was largely unionized, and while most other employers in the construction business in the area operated under union shop contracts, plaintiffs remained adamant regarding retention of an open shop. Despite failure of the USES to refer labor to plaintiffs on this

project, work was completed satisfactorily and this contract is not involved in the present proceeding.

When, in September 1943, plaintiffs accepted contract 2124, the earliest of the four contracts presently before us, they knew or should have known of the possibility of labor disputes arising during the course of their performance of the contract, and plaintiffs were aware of the action that would be taken by the USES upon its receipt of any notice of the existence of any such dispute. Work was begun preparing the site for performance of contract 2124 on October 6, 1943, by a small force of plaintiffs' employees who had been recruited by plaintiffs without assistance of the USES. On October 6, 1943, the Alliance of Tulsa Building Trades (hereinafter the "Alliance"), notified the USES office of the existence of labor difficulties with plaintiffs regarding the work on contract 2124. The USES office thereafter declined to honor plaintiffs' subsequent requests for referrals of labor for work on contract 2124.

After concerted effort by various individuals including a commissioner of conciliation of the United States Conciliation Service, Department of Labor, an oral agreement for settlement of the dispute was reached between the Alliance and plaintiffs on November 7, 1943. As part of the agreement plaintiffs agreed that after December 1, 1943, only union workers would be employed on the project, while the union agreed in return to withdraw the notice of dispute it had filed with the USES. During the weeks immediately subsequent to this agreement the USES referred labor as requested by plaintiffs to the project. By the end of November, 173 workmen were working on the project, most of whom belonged to the union.

Soon after the agreement had been reached it became apparent that the parties disagreed on its meaning. Plaintiffs were of the belief that pursuant to the agreement they were required to employ only union workers in all hiring done after December 1, 1943, but that those workers who had been hired prior to that date and who held no affiliation with the union would not be required to secure union membership as a condition to continued employment. On the other hand the Alliance construed the agreement as requiring an absolute union shop operation covering all employees after December 1, 1943. As this misunderstanding had not been resolved by December 1, 1943, on that date the Alliance filed another notice of the existence of a labor dispute with the USES. On December 6, 1943, work on the project ceased because of a strike and picket line by 153 union members. This action violated the no-work-stoppage clause of the stabilization agreement of July 22, 1941 between construction trade labor unions and certain government contracting agencies. By December 8, 1943, however, plaintiffs had assembled a full crew composed of some returning strikers and some newly hired workers who had been recruited by the plaintiffs themselves. On December 8, 1943, the USES notified plaintiffs that it would make no further referrals of workers to the project pending settlement of the dispute. At no time during the entire period of work in performance of contract 2124 did plaintiffs request the Regional Director of the War Manpower Commission to direct the USES to resume referrals pursuant to his authority to do so if he found, in the exercise of his discretion, that resumption of referrals was in the best interest of the war effort notwithstanding the existence of the dispute. The Regional Director was endowed with such authority but took no action regarding it as to work on contract 2124.

On December 10, 1943, a conciliation commissioner of the United States Conciliation Service was again assigned to attempt to resolve the dispute. Plaintiffs declined to meet with the commissioner personally, informing him through their superintendent that as far as they were concerned the dispute had been settled by the November 7, 1943 oral agreement and that satisfactory progress was being made on the project, which was

fully manned. The commissioner concluded that there was no possibility of his settling the dispute and advised the parties that he was reporting this to the Conciliation Service for certification to the appropriate agency for further review, which action would undoubtedly delay a decision until after work on the project had been fully or substantially completed. The controversy was referred to the appropriate agency but the matter was never resolved.

The history concerning work on the other three contracts is similar to that surrounding performance of contract 2124, and for present purposes only a few additional circumstances need be related. Initially, since the three remaining contracts were undertaken by plaintiffs on December 9, 1943, January 3, 1944, and February 29, 1944, it is obvious from the chronology that plaintiffs should have anticipated labor difficulties of the type experienced while performing contract 2124 when they committed themselves under the three remaining contracts. Furthermore, on July 1, 1944, due to the increasing shortage of skilled labor in the Tulsa area, a priority system was effected by the War Manpower Commission for the area whereby assignments of labor to specific projects were made dependent upon the priority rating assigned the project in accordance with the degree of importance it bore to the effective prosecution of the war effort. The evidence indicates that plaintiffs' projects would not have received sufficiently high priority ratings to have warranted referrals of labor from the USES under this system, even had the USES been disposed to refer labor notwithstanding the existing labor disputes. Finally, with regard to the three remaining contracts, on August 23, 1944, plaintiffs appealed to the Regional Director of the War Manpower Commission to exercise his discretionary authority to have the USES refer labor for work on plaintiffs' projects notwithstanding the existing labor disputes. The Regional Director sought the advice of his regional Labor-Management Advisory Committee, which voted almost unanimously to deny the appeal. The Regional Director declined to exercise his authority contrary to the advice of the committee and on September 2, 1944, notified plaintiffs that their appeal had been denied. Inasmuch as work on these three remaining contracts had been fully or substantially completed at the time plaintiffs finally made this appeal to the Regional Director, there is serious doubt as to whether favorable action by the Regional Director at that time would have made any appreciable difference in performance of the contracts.

It is plaintiffs' position that the failure of the appropriate government agencies to resolve plaintiffs' labor disputes, the refusal of the USES to refer labor to plaintiffs' projects because of the existence of the labor disputes, and the failure of the Regional Director of the War Manpower Commission to direct the USES to refer labor to plaintiffs' projects notwithstanding the existence of the labor disputes, prevented plaintiffs from manning their projects on the four contracts with a sufficient number of skilled laborers. Plaintiffs aver that because the Government thus prevented them from securing an adequate labor force they suffered losses aggregating over $400,000 in the performance of the four contracts, for which the Government is legally and equitably obligated to reimburse them.

We do not agree with plaintiffs' position. On the basis of the record before us we are not persuaded to alter our original conclusion that plaintiffs have established no legal right to recover the sums sought. Moreover plaintiffs have failed to prove any equitable obligation of the Government regarding their claims.

Initially, the Government undertook no obligations in any of the contracts that could in any way be construed as insuring plaintiffs sufficient labor to perform the contracts. The invitations for bids on each of the contracts were explicit in placing the bidders on notice that the contrary situation prevailed, for the invitations provided in part as follows:

"Prospective offerers or their authorized agents are expected to * * acquaint themselves with all available information, including local conditions and the availability of labor, and to make their own estimates of the * * * difficulties attending the execution of the work. Such estimates are expected to include a consideration of * * * all * * contingencies. No allowance will be made by the Government for failure of an offerer to * * * estimate correctly the difficulties attending the execution [of the work] * *."

Furthermore, each set of specifications, incorporated in each contract, contained the following provision:

" * * * delays to scheduled progress of the contract work which may be caused * * * by labor difficulties shall be offset by the addition of sufficient plant and labor to enable the work to be completed within the contract period. * * * "

It is difficult to conceive of language that could more clearly apprise the contractor of the burden of securing sufficient labor than that set out in the quoted portions. Yet in the face of these provisions and with full knowledge of the fact that their policies had resulted in labor disputes on previous projects in the same geographical area, plaintiffs actively sought the contracts. Having been thus apprised of their responsibilities under the contracts and the existing labor situation in the area, plaintiffs' present attempt to shift the burden of their labor difficulties to the Government appears clearly misdirected. Inasmuch as plaintiffs had on a previous contract been denied referrals of labor by the USES in consequence of the existence of a labor dispute based on the identical labor policy, they cannot claim to have been surprised when the USES pursued the same course when labor disputes arose on the projects presently in issue.

■■ Plaintiffs do not challenge the legality of this policy, but rather allege that its application by the USES was discriminatory toward them. Plaintiffs contend that the Regional Director of the War Manpower Commission was motivated by prejudice toward them when he declined to exercise his discretion to direct the USES to resume labor referrals to plaintiffs' projects notwithstanding the existence of the labor disputes. This allegation of prejudice is founded solely upon the hearsay statement of one individual who acknowledged in his testimony at trial that the basis of his statement was gossip. We cannot accept an allegation of prejudice or fraud against a responsible government official when based on anything less than evidence constituting clear and convincing proof. Nichols & Company v. The United States, No. 98–54 (decided March 7, 1962). Certainly we cannot accept such an allegation when supported exclusively by admitted gossip. Moreover, as noted earlier, plaintiffs did not request the Regional Director to exercise this authority until August 23, 1944, when work was completed on contract 2124 and at least substantially completed on the other three contracts. Furthermore, this court can hardly find the Regional Director's decision not to exercise this authority arbitrary when nine of the ten members of his advisory committee voted against his exercising it.

We find equally without merit plaintiffs' contention that because the USES would not refer labor to work on plaintiffs' projects due to the existence of labor disputes, the Government was obligated to settle those disputes. Initially, it should be noted that the fact that the USES declined to make labor referrals did not perforce deprive plaintiffs of adequate labor to perform their contractual obligations. Plaintiffs were free to recruit their own labor force subject only to two restrictions: (1) they could not employ "in-migrant" workers (i. e. workers who had come into the Tulsa area within the 30-day period immediately preceding the hiring) unless the "in-migrant" worker obtained a statement of availability from the Tulsa office of the USES, and (2) they could not hire

a worker who during the 60-day period immediately preceding the hiring had been employed in an essential industry in the Tulsa area unless the worker had a statement of availability from his previous employer or the Tulsa office of the USES. These regulations were designed to stabilize the labor situation to enable essential industry to best serve the war effort. Plaintiffs do not challenge their validity. Plaintiffs did recruit their own labor in the absence of referrals from the USES, and on occasion they did so in a manner proscribed by the regulations. While the labor may not have been as efficient as it would have been had the USES made referrals, we do not believe that the record would support a finding that whatever losses were incurred due to this uncertain diminution of efficiency resulted either legally or equitably from culpability attributable to the Government.

While it is true that the dispute was referred to government agencies charged with settling labor disputes, particularly the Wage Adjustment Board, it is difficult to perceive how the Government's failure to settle plaintiffs' labor dispute can inure to plaintiffs' benefit. The powers of these agencies were limited. On one occasion when a conciliation commissioner of the United States Conciliation Service sought plaintiffs' cooperation in resolving a dispute, plaintiffs proved uncooperative. Certainly plaintiffs were in at least as favorable a position as the Government to settle the dispute. Consequently, and in view of the provisions of the contract placing the burden of securing sufficient labor to perform their obligations squarely on the plaintiffs, we find no basis of liability in the Government's action.

While this case comes before us pursuant to a resolution of the House of Representatives and not under the Lucas Act (60 Stat. 902, as amended; 62 Stat. 992), 41 U.S.C.A. § 106 note, which provided for the granting of equitable relief for losses sustained by certain contractors during World War II, it might be well to consider the standards prescribed by Congress in that statute for relief in cases similar to the one at bar. One of the standards prescribed in the Lucas Act was that any recovery of losses suffered by a contractor on an individual government contract should be limited to overall net losses which the contractor suffered on all of his World War II government contracts. Including the four contracts presently before us, plaintiffs had an overall net profit of at least $160,000 on all their contracts with the United States during the World War II emergency period. Thus, pursuant to the standard prescribed by Congress for the granting of equitable relief under the Lucas Act, plaintiffs would not have been entitled to any recovery.

In summary we might add that while plaintiffs may have suffered losses due to inadequate labor in performance of the four contracts presently before us, whatever losses were thus incurred were attributable to a chain of circumstances including plaintiffs' labor policies, aggressive union practices, and the general manpower shortage consequent to the industrial demands of the war effort, rather than to government dereliction or culpable inaction. What part the Government took in the ultimate situation resulted from the uniform application of reasonable policies required by the unique demands upon the nation in the effective prosecution of the war effort, from which plaintiffs benefited as citizens of the republic. Plaintiffs were aware of these policies, of union practices, and of the labor situation in the Tulsa area when they bid on the contracts. Whether or not they were justified in adhering rigidly to their labor policies, plaintiffs should have anticipated precisely the events as they ultimately developed. Plaintiffs were placed on notice when they bid on the contracts that the responsibility for securing adequate labor and resolving any labor problems that arose rested with them. We cannot now find any basis in law or in equity whereby the Government has become obligated to reimburse plaintiffs for any losses suffered in the performance of the four contracts

involved in this proceeding. We therefore recommend that no recovery be awarded.

This opinion along with the accompanying findings of fact will be reported to the House of Representatives pursuant to the resolution of July 3, 1956, of the House of Representatives (H. Res. 531).

It is so ordered.

JONES, Chief Judge, and LARAMORE and WHITAKER, Judges, concur.