SEA–GATE, INC., and Charles M.
Reeves, Jr., Plaintiffs,

v.

The UNITED STATES, Defendant.

Congressional Reference No. 2–76.

United States Claims Court.

Nov. 29, 1983.

Donald L. Mooers, Potomac, Md., for plaintiffs.

James T. Draude, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

OPINION

MAYER, Judge.

This congressional reference case was filed by plaintiffs, Sea-Gate, Inc., and

Charles M. Reeves, Jr.,* in 1976 pursuant to the referral by the United States Senate of S. 3518, 94th Cong., 2d Sess. (1976), under the provisions of 28 U.S.C. §§ 1492 and 2509, as amended. The case was tried in the old Court of Claims over a period of seven months during 1978 and 1979. Post-trial briefing was completed in 1982. The case was transferred to this court by the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 403(d), 96 Stat. 58. Thereafter, the judge who presided over the proceedings became ill and retired, and the present judge was assigned the case. The parties jointly moved that the case be decided on the record as made and declined to request a new trial. This motion was granted. *Sea-Gate, Inc. v. United States,* 1 Cl.Ct. 699 (1983).

## FACTS

The Atlantic Inland Waterway (Waterway) extends from Massachusetts to Florida. As directed by statute in 1907, Rivers and Harbors Act of 1907, Pub.L. No. 168, ch. 2509, 34 Stat. 1073, 1083, and in 1912, Rivers and Harbors Act of 1912, Pub.L. No. 241, ch. 253, 37 Stat. 201, 206, the United States acquired fee simple title to land in a strip between 300 and 1000 feet wide for construction of the Waterway between Pamlico Sound and Beaufort Inlet in North Carolina. This segment included land in the Core Creek area, the location of the Sea-Gate property which is the subject of this suit.

In 1955 the Wilmington District of the Army Corps of Engineers reported property, including that in the Core Creek area, to the General Services Administration (GSA) as excess to the government's needs. Among the possible uses for the land noted on the internal excess property report were commercial and dwelling purposes, although later amendments to the report deleted that notation. GSA offered it to the public in 1957 at an auction sale conducted by a private auctioneer. Among the advertise-

ments the auctioneer circulated before the auction was a brochure which suggested the uses for the land to be sold and included references to recreational opportunities, hunting and fishing, commercial timber operations, commercial operations, and a statement: "Get an acreage tract—sell lots to others."

At the auction sale, the United States sold the land in fee to a group of individuals represented by Sherman Rock, but retained a perpetual easement. The government owns two types of easements along the Waterway. One is known as a right-of-way easement, the other as a spoil disposal easement. Generally, right-of-way easements include the right of the government to excavate, dig and cut away land for construction and maintenance of the Waterway, or any enlargement of it, and the right to place spoils dredged from the Waterway on any lands that are not excavated or cut away. A right-of-way easement also serves as a buffer zone to keep construction from encroaching too close to the Waterway, thereby reducing risks of claims against the government if erosion occurs.

A spoil disposal easement only permits the government to put dredged spoils on the lands subject to it. The Waterway is continuously dredged by the Corps of Engineers.

The easement retained in this case was of the right-of-way type and recited in pertinent part:

> [T]here is reserved to the Government and its assigns the perpetual right and easement to maintain the said Intracoastal Waterway and to enter upon, dig or cut away, and remove any or all the hereinbefore described tract of land as may be required at any time in the prosecution of the aforesaid work of improvement, or any enlargement thereof, and maintain the portions so cut away and removed as a part of the navigable waters of the United States; and the further right to maintain the aids to navi-

---

* Unless otherwise indicated, references in this opinion to "plaintiffs" or "Sea-Gate" include both plaintiffs.

gation presently established by the United States on the land herein described with the rights of ingress and egress thereto; and the further perpetual right and easement to enter upon, occupy and use any portion of said tract of land, not so cut away and converted into public navigable waters as aforesaid, for the deposit of dredged material, and for the placement thereon of such aids to navigation deemed necessary by the Government, and for such other purposes as may be needful in the preservation and maintenance of said work of improvements; provided, however, that the party of the second part, his heirs and assigns[,] shall enjoy all such rights and privileges in said tract of land as may be used and enjoyed without interfering with or abridging the exceptions and reservations herein contained.

The quitclaim deed containing this retained easement was duly recorded. In 1965, the land was sold to Ben Coleman, who promptly reconveyed it to a corporation he partly owned, Crest-Way, Inc., and the government's easement was referenced in the deeds effecting these conveyances. Crest-Way added to its holdings by purchasing other tracts outside the easement area.

One of the plaintiffs, Charles M. Reeves, Jr., purchased the land along the Waterway in the Core Creek land cut in March of 1972 from the Coleman corporation, part of which was subject to the United States' right-of-way easement. Reeves knew of the government's easement of record when he purchased the property and neither he nor any of his representatives discussed it with federal officials before he bought. Reeves thereafter transferred the property to Sea-Gate, Inc., to develop an extensive residential subdivision of some 769 lots, 254 of which were to be waterfront lots along three miles of both banks of the Waterway within the right-of-way easement retained by the United States.

In anticipation of an application by Sea-Gate for a permit from the Corps of Engineers to connect a marina to the Waterway, in August of 1972 representatives of Sea-Gate met with those of the Corps for the first time to discuss permit application requirements. In the course of the meeting, a map of the proposed Sea-Gate development was reviewed and the Corps' representatives expressed concern about plans to build in the easement area. The Sea-Gate people said they saw no risk in their construction plans within the easement.

On October 13, 1972, Sea-Gate applied to the Wilmington District of the Corps of Engineers for a permit to connect the marina to the Waterway. The application was not processed, as Sea-Gate was then advised, because the Corps was awaiting advice about other cases in the district involving interference with government easements.

Between the time its permit application was filed and October 15, 1973, representatives of Sea-Gate met with the Corps of Engineers on a number of occasions during which meetings the Corps' concern about construction of houses in the easement was reiterated. The Corps agreed to issue a public notice to see if there were any objections other than its concern about interference. Sea-Gate secured options on three areas in the vicinity, which were already subject to an easement, to be used by the engineers for diked spoil disposal during dredging operations. Theretofore, open water disposal of effluent from maintenance operations in that area had been used by the Corps. However, in March of 1973, for ecological reasons the federal Fish and Wildlife Service and the North Carolina Department of Natural and Economic Resources asked that diked spoil disposal areas on fast land be used instead.

Corps officials inspected the areas designated by Sea-Gate for diking. For reasons of economics and convenience, the Corps' preference was to retain the ability to deposit dredged materials at changing locations within the easement, rather than be limited to a few fixed sites. Nevertheless, depending on the height of the dikes built to retain the spoilage, it determined that the proposed areas could be used anywhere from 4½ to 36 years. Areas circumscribed

by dikes of three feet would last 4½ years; those circumscribed by dikes of 27 feet would last 36. However, 27 foot dikes are significantly more expensive than a series of dikes three to four feet high.

At one of the meetings, Sea-Gate told the Corps that it intended to proceed with its building plans even if its marina permit application was denied. It issued a deadline of April 16, 1973, for a Corps decision, after which it would begin to subdivide the remaining area into lots.

The Corps of Engineers was in a peculiar position when faced with plans to develop property within a federal easement along the Waterway. Except for construction directly subject to the permit program it administers, such as the instant connection of a marina to the Waterway or the building of such things as retaining walls or piers in the Waterway, there is no way the Corps can directly control construction short of litigation which is discretionary with the Department of Justice. When a party applies for a permit for purposes subject to the Corps' control, the Corps may condition its issuance on compliance with requirements covering matters such as upland construction not directly related to the subject of the permit or located in the navigable waters. But refusal to agree to the conditions and denial of a permit will not prevent an erstwhile applicant from proceeding with construction.

In this case, in the face of Sea-Gate's avowed intention to proceed with development regardless of whether or not the Corps issued a permit for the marina, permit conditions would have been unavailing and the Corps pursued two other courses of action simultaneously. On one hand, it sought advice through channels about litigating the easement interference issue; on the other hand, in the event litigation to keep the right-of-way easement free of development was not approved by the Chief of Engineers or the Department of Justice, the district Corps officials continued to consider the feasibility of Sea-Gate's proposed spoil disposal set aside areas.

The other concern was that since one of the stated purposes of the easement was to permit future enlargement of the Waterway, significant development would make enlargement at least more expensive and perhaps impracticable. At trial, future enlargement of the Waterway was the subject of controversy. It was conceded that there were no current plans for widening although it had been discussed intermittently. In any event, none could take place absent authorization of a study by Congress, study by the Corps, and an authorization for enlargement by an act of Congress.

Though the authority to deny a permit in this situation reposed in the Chief of Engineers in Washington, district officials consulted with their next higher command in the South Atlantic Division of the Corps about the situation. The final guidance was that all efforts should be made to preserve the rights of the government in the easement and that issuance of a permit in the circumstances would be inimical to those interests. Subsequently, on August 3, 1973, the Corps recommended that the Justice Department seek to enjoin Sea-Gate from constructing permanent buildings on the lands subject to the government's easement and on October 15, 1973, it denied the marina permit.

Sea-Gate responded by filing suit in the United States District Court for the Eastern District of North Carolina against the Corps to compel it to issue a permit. The government filed suit in the same court against Sea-Gate seeking an order declaring construction of buildings on lands subject to the easement inconsistent with the easement rights and an injunction against construction on those lots, 254 of 769, within the right-of-way.

In July of 1974, the parties settled Sea-Gate's suit to compel the Corps to issue a permit. Essentially, Sea-Gate agreed not to sell lots and not to construct permanent improvements in the easement until the conclusion of the United States' suit. The Corps agreed to reconsider the application for a marina permit. The district court

approved the settlement, and the permit was issued on August 22, 1974.

Trial of the Corps' case against Sea-Gate was held in July 1975. The court ruled that construction of houses along the east bank of the Waterway in the Sea-Gate development would unreasonably interfere with the government's easement rights, and that construction of houses along the west bank would not unreasonably interfere with the easement so long as any houses built were set back 40 feet or more from the top of the existing bank. *United States v. Sea-Gate, Inc.,* 397 F.Supp. 1351, 1359 (E.D.N.C.1975). Neither party appealed. The effect of the decision was to permit construction on 125 lots within the right-of-way easement for approximately three miles along the west bank of the Waterway.

Nevertheless, in August of 1975 Sea-Gate officially terminated all lot sales in the development, and initiated this action claiming that it became an unsalvageable, unviable business venture because of illegal and unconstitutional acts of the Corps of Engineers. The evidence at trial did not show why Sea-Gate came to this pass when it had at least partially won the suit in the district court and the decision in that case prohibited residential construction on only 118 of the 769 lots in the development. However, in response to a post-trial inquiry by the presiding judge, defendant posited that in light of remarkably poor economic conditions, indeed a severe recession, Sea-Gate made a business decision to halt all sales. Plaintiffs, on the other hand, lay the blame either directly or indirectly on the actions of the government which form the basis for this suit and request $10 million in compensation.

## STANDARD

▮ The issue is whether plaintiffs have a legal or equitable right to legislative relief in Congress or whether any relief would amount to a gratuity. *See* 28 U.S.C. § 2509(c). Plaintiffs have no legal right to relief because the substance of the matter now before the court was the subject of rulings in the United States District Court for the Eastern District of North Carolina, as was recognized by the Senate Committee on the Judiciary when considering the matter before referral to this court. *See* S.Rep. No. 94–1131, 94th Cong., 2d Sess. (1976). A congressional reference case in this court cannot reconsider legal claims made and rejected in prior litigation, *Group v. United States,* 165 Ct.Cl. 612, 615 (1965); *Fairbank v. United States,* 164 Ct.Cl. 1, 8 (1964), nor claims that have been subject to prior litigation and were compromised by the parties, *see Drake America Corp. v. United States,* 168 Ct.Cl. 318, 325 (1964). The question then is whether plaintiffs have an equitable right to monetary relief from Congress because of activities by officials of the United States.

"The word 'equitable' in a congressional reference case was interpreted originally as meaning a broad moral responsibility on the Government's part. *Burkhardt v. United States,* 113 Ct.Cl. 658, 667, 84 F.Supp. 553, 559 (1949). *See generally Glosser, Congressional Reference Cases in the United States Court of Claims: A Historical and Current Perspective,* 25 Am.U.L.Rev. 595, 617–25 (1976). This view, however, has eroded over the years and more recent cases have adopted the rule that the United States must commit some 'wrong' in order to incur liability under an equitable claim. *The Innocent Victims of the Occupation of Wounded Knee, South Dakota v. United States,* Cong.Ref. No. 4–76, slip op. at 31 (Ct.Cl. June 10, 1981) (LYDON, T.C.); *see also Webb v. United States,* 192 Ct.Cl. 925, 932 (1970); *B. Amusement Co. v. United States,* 148 Ct.Cl. 337, 342–43, 180 F.Supp. 386, 390 (1960). 'An equitable claim on a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrongdoing] on the part of governmental employees, any award herein would be a gratuity.' *Wong v. United States,* Cong.Ref. No. 3–74, slip op. at 12–13 (Ct.Cl. November 23, 1977) (LYDON, T.C.); *see also Kochendorfer v. United States,* 193 Ct.Cl.

1045, 1055 (1970). Thus, in order to recover under an equitable claim theory a claimant must show that: 1) the government committed a negligent or wrongful act, and 2) this act caused damage to the claimant." *Shane v. United States,* 3 Cl.Ct. 294, 304 (1983) (YOCK, J.), *adopted,* Cong.Ref. No. 1–79 (Cl.Ct. Nov. 1, 1983). Against this standard, the court must measure the actions of the United States of which plaintiffs complain.

## SELECTIVE ENFORCEMENT

The most significant accusation plaintiffs make is that the government selected them for enforcement of its easement rights while not taking comparable action against a multitude of others who similarly violated the easement. They variously allege this to have been impermissible selective enforcement, discrimination and violation of their constitutional right to equal treatment under the law.

Plaintiffs do not claim infringement of their right to equal protection under the Fifth Amendment because of statutory and administrative classifications. *See, e.g., Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). The thrust of their complaint is that the Attorney General violated this protection by wrongfully exercising his discretion to enforce the government's rights against them and not pursuing others who were doing the same things.

■ "The conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation . . . ," *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), and the government's obligation to protect property interests it holds as a national trust does not admit lightly of a claim by developers that it has forfeited its right to do so. *See United States v. California,* 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889 (1947); *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917). A court's duty when an allegation of wrongful selectivity is made is to determine whether the complainant has shown

that others similarly situated have not been subject to enforcement and that the decision to proceed against the complainant is based on an impermissible motive. *See Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); *United States v. Wayte,* 710 F.2d 1385, 1387 (9th Cir.1983); *Tollett v. Laman,* 497 F.2d 1231, 1233 (8th Cir.1974).

■ Selective prosecutorial decisions based on wrongful considerations of matters such as race or the exercise of a constitutional right may give rise to judicial intervention. *See, e.g., United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir. 1980). But in this case there is no suggestion that the motivation of the government was so based. Rather, it appears the foundation of plaintiffs' complaint is that violations of the government's easement have been widespread and no action has been taken to prevent them. The singling out of these plaintiffs from all the others is so egregious and unfair that at least as a matter of equitable treatment and without more the losses thereby incurred should be compensated. Essentially, under plaintiffs' theory, the government's toleration of massive incursions upon the easement in the southeastern United States is sufficient reason to declare this sole prosecution meritless and to justify their purchase and development of the property in the expectation that the government would not try to stop them. As the predicate for this argument, plaintiffs must establish the magnitude of the violations alleged and show that they are of the same or similar characteristics as the one established against them. If they cannot show this, there is no occasion to consider the sufficiency of the rest of their argument.

It should be recalled that the only way the government can prohibit construction unrelated to a permit within the easement is to bring suit and prevail in court. Short of litigation, the Corps of Engineers can, as it does, issue hortatory warnings which parties intent upon building can ignore. Denial of the permit only prevents work in navigable waters. It does not prevent con-

struction on high ground within the easement if an owner chooses to go forward with it, as illustrated in this very case by Sea-Gate's stated intent to begin construction in the right-of-way easement even if it were denied a marina permit. The decision whether to resort to litigation involves considerations of resources as well as the likelihood of persuading a court that proposed construction would unreasonably interfere with the government's rights in the easement. Indeed, the government only partially prevailed against Sea-Gate in district court. And in another case, *United States v. Waterway Mobile Homes Park, Inc.,* Civ. No. 73–547 (D.S.C. Sept. 25, 1974), brought against a violator of a spoil disposal easement in South Carolina, the court ruled that operation of a mobile home park in the easement did not unreasonably interfere with the government's rights. Assuming those considerations of the government are not in and of themselves sufficient justification to prosecute one violator over another, the court will consider whether plaintiffs were wrongfully singled out while similar violators were not pursued.

■ To determine whether other persons not sued are situated similarly to plaintiffs, the court must determine if there are factors permitting some rational basis for distinguishing among them. *See McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973). The record demonstrates that there are several significant differences between plaintiffs' operations and others they claim were the same. They cited situations in Florida, South Carolina and other areas of North Carolina, all of which come under the South Atlantic Division of the Corps of Engineers and should be controlled by the same policies even if policies might differ in other divisions along the Waterway. The court concludes that when the type of easement, the availability and responsibility of local sponsors, and the nature, extent and location of construction are considered, Sea-Gate stands out as unique.

*Florida*

In Florida, easements along the Waterway are of both types, right-of-way and spoil disposal. No construction occurs within the right-of-way easement there, and encroachment on spoil disposal areas is minimal. A local sponsor in Florida, the Florida Inland Navigation District (FIND), actively and effectively deals with encroachments in the disposal areas and provides new areas as they are needed by the Corps. There is no need to bring actions to enforce the government's right-of-way easement rights in Florida because everyone complies with the prohibition on building. FIND has the power to tax and to initiate condemnation proceedings in the execution of its responsibilities.

There is no local sponsor at Sea-Gate. Sea-Gate likens the practice in Florida of releasing unneeded spoil disposal easements to its proposal to designate three spoil disposal areas. The Florida practice, however, relates only to spoil disposal easements, not right-of-way easements to which Sea-Gate's land was subject. And the areas Sea-Gate sought to set aside were already subject to an easement.

Plaintiffs also say that in Florida massive developments have been constructed and thousands of citizens live in buildings located on former or existing government perpetual easement areas. Construction in areas formerly subject to an easement is not relevant. The construction in the existing Florida easement consists of only a few buildings in spoil disposal areas while Sea-Gate proposed extensive construction along both sides of the Waterway in a right-of-way easement.

*South Carolina*

In South Carolina, the government owns both spoil and right-of-way, there called "prism," easements. As in Florida, South Carolina has a local sponsor, the South Carolina State Development Board, which has a continuing responsibility to provide spoil disposal areas, and to acquire necessary property by purchase, donation or condemnation, when necessary. Also, as in Florida, there are no buildings within the right-of-

way easement in contradistinction to Sea-Gate.

Both the right-of-way and spoil disposal easements the United States holds in South Carolina contain a "waiver and release" clause which the easement at Sea-Gate does not. The effect of this clause is to hold the United States harmless for any damages which result from construction and maintenance of the Waterway and the deposit of spoil. The district court in *United States v. Waterway Mobile Homes Park, Inc.*, Civ. No. 73–547 (D.S.C. Sept. 25, 1974), relied on that clause when ruling on the government's suit against the operator for unreasonably interfering with the spoil disposal easement by constructing a park for semipermanent mobile homes in it. That difference from Sea-Gate's easement and the fact that the structures were mobile were found sufficient by the court to reject the government's claim of unreasonable interference. *Id.* at 13–14. The suit also illustrates that Sea-Gate is not the only subject of the government's efforts to preserve its easement.

Another event in South Carolina plaintiffs allege as a wrongful disparity in treatment was the government's consent to construction of a golf course in a spoil disposal easement. That consent, however, occurred after the *Waterway Mobile Homes Park* case went against the government. It was conditioned on retention by the government of its right to use the area for spoil disposal and the owner's construction, at its own expense, of any necessary dikes, spillways and ditches for spoil disposal upon notice by the district engineer. The building of a single clubhouse at the golf course in a spoil disposal easement is not comparable to Sea-Gate's extensive construction plans in a right-of-way easement. Other illustrations proposed by Sea-Gate are equally distinguishable and provide no comfort for its position.

*North Carolina*

Plaintiffs drew comparisons between Sea-Gate and construction within the right-of-way easement at other locations in North Carolina: Wrightsville Beach, Holden Beach, Ocean Isle Beach, and the Coinjock and Hobucken areas. It appears, however, that at Wrightsville Beach, except for docks and piers subject to Corps permits, on the west side of the Waterway there are no buildings in the right-of-way easement. On the east side, there are only four, a marina, which was formerly a Navy facility; a restaurant, which has been there since the early 1950's; a store; a house; and a state-owned public boat ramp. By comparison to the scale of Sea-Gate's plans, these are insignificant.

At Holden Beach, the state is the local sponsor for the Waterway with continuing responsibility to provide spoil disposal areas as needed free of cost to the government. In the 1960's, the Corps issued permits for construction of some canals from the Waterway in a Christmas tree-like pattern which were intended to keep construction out of the easement yet give access to the water. For reasons not evident from the record, however, some houses have been constructed in the easement. It was suggested this occurred through inadvertence or because the easement reservation was mistakenly dropped from conveyance instruments over the years. In any event, all of them are set back at least 200 feet from the Waterway. This setback is more stringent than the 40 foot requirement the district court imposed on Sea-Gate. Spoil disposal and erosion buffering are therefore not compromised. The difference between these unexplained violations and Sea-Gate's proposal is obvious and significant.

In another area of Holden Beach known as Sea Oats, some of the lots are platted within the right-of-way easement and plaintiffs complain of the government's failure to bring suit to halt development there when it sought to enjoin Sea-Gate. There is no evidence, however, that development of those lots had then occurred. In any event, the number of lots at issue is small compared to the Sea-Gate plan. They do not line the Waterway at Sea Oats as they did at Sea-Gate. Only 18 are within the right-of-way and even Sea-Gate was

permitted to build on 130 lots within the easement by the district court.

Plaintiffs say that some 641 platted lots are shown within the right-of-way easement on the town map of Holden Beach. But many of them and roads also shown on the map are not in existence because of erosion or are covered over by diked disposal areas. The right-of-way line on the town map was not surveyed; therefore, lots shown as being within the easement may not be. Most of those shown are set well back from the Waterway in comparison with Sea-Gate's intended construction.

Finally, plaintiffs say that a 1978 federal assistance grant for construction of a municipal water system for Holden Beach and the Corps' issuance of a permit to lay a pipeline across a sea inlet, not part of the Waterway, fostered development within the right-of-way. The basis for this allegation is not apparent but, because the Corps had diked all available high ground within the right-of-way, further areas for development were no longer available in any event.

At Ocean Isle Beach, North Carolina, construction at two developments authorized by Corps permits in 1960 and 1961 intrudes on the right-of-way easement. The development permitted in 1960 consists of four parallel canals, and some houses adjacent to them have been built within the right-of-way. By comparison with Sea-Gate's plans for development of six shoreline miles, however, this subdivision occupies only 1,200 feet of the shoreline. The experience with it led the Wilmington District to adopt the Christmas tree design it hoped would be more effective in keeping houses outside the right-of-way. The other development, built with the Christmas tree canal design, nevertheless had some houses built along one side of the cross channel within the easement. But all of them are back at least 400 feet from the banks of the Waterway. The rest of the land within the right-of-way at Ocean Isle Beach is covered by diked disposal areas or marshes.

On the east side of the Waterway at Coinjock there is no construction except for docks subject to permit. On the west side there are one or two buildings in the right-of-way easement, the largest being a boathouse on a dock subject to permit. Likewise, at Hobucken there are no buildings on the west side of the Waterway in the easement, but some do exist on the east side and include a Coast Guard facility and a state owned boat ramp. In neither of the areas, however, are there encroachments comparable to the Sea-Gate plan.

In an all-inclusive allegation covering North Carolina, as well as South Carolina and Florida, plaintiffs allege that thousands of permits have been issued for lands in the Waterway or adjacent to it within the easement which support or condone development. The Corps permits are for work or structures in navigable waters of the United States and not for improvements on fast land. Structures in navigable waters subject to permits are not inconsistent with easement rights because the permits are revocable and, if revoked, the permittee must remove the structure without the necessity of legal action. There is a significant difference, too, between docks, piers and bulkheads in the Waterway subject to revocable permits, and houses in the right-of-way easement which cannot be reached by the permit process.

■ There were sufficient and measurable differences between Sea-Gate and all others to justify the government's attempt to protect its property interest. The merit of the United States' position was confirmed by the district court decision recognizing and ostensibly preserving the usefulness of the easement, yet accommodating a significant part of the Sea-Gate project. There simply was no impropriety in the government's actions. Any inconvenience to plaintiffs was invited by their error in failing to properly prepare before they purchased the property and launched their expensive enterprise.

## RELIANCE

■ Plaintiffs allege that in 1957, when the property was sold to the initial purchasers, the Rock group, defendant represented

through advertisements and statements of government officials that the property was suitable for "commercial and dwelling purposes." They say that Rock relied on these representations and that by a "chain of reliance" through the subsequent owners they also relied to their detriment on the representations. If, alternatively, the representations were false, defendant committed fraud. It is improbable that a prudent businessman would rely on alleged representations or misrepresentations made over 15 years earlier. Significantly, plaintiffs never mentioned them or their reliance during any of the dealings they had with the Corps before embarking on litigation.

Sea-Gate's legal claims about these representations were disposed of in the district court trial of defendant's injunction request, 397 F.Supp. at 1355, 1360, and are *res judicata*. *Group v. United States,* 165 Ct.Cl. at 615. On familiar principles, this court may not reexamine the legal sufficiency of that ruling here. *Id.; Fairbank v. United States,* 164 Ct.Cl. at 8.

As an equitable matter, as well, plaintiffs have shown no entitlement to relief. They have not shown that agents of the government made any statements to them on which they relied, *see Drake America Corp. v. United States,* 168 Ct.Cl. 318, 326–27 (1964); *Krueger v. United States,* 161 Ct.Cl. 599, 607 (1963), much less clear and convincing evidence that fraudulent misrepresentations were made. *See Ottinger Brothers v. United States,* 157 Ct.Cl. 12, 21, 301 F.2d 336, 340 (1962). To have proceeded with a development of this magnitude on the basis of a 15 year-old advertising brochure or vague hearsay about statements by unknown persons equally as stale is unreasonable, especially in light of the clear and unequivocal language of the after-recorded easement. It should not go unremarked, however, that to the extent a passage in the brochure suggested the amenability of the property to dwelling purposes, some 335 acres disposed of in that transaction were not subject to the easement and might indeed have been so used.

Similarly, reliance on representations alleged to have been made by government officials to the original purchasers was misplaced. The evidence showed that representatives of the Rock group met with various officials of the Corps and GSA before purchasing the property. Their plans, if they succeeded in purchasing it, did not include construction of houses or other buildings on the land subject to the easement. Thereafter, when the property was declared surplus to the government's needs, the United States entered into an auction sale agreement with a private auctioneer. The agreement made clear that the property was being offered subject to the easement. The private auctioneer prepared the brochure and it was received by Rock a week before the auction, after his group had already decided to bid for the property, and they placed no reliance on it.

Before the auction sale, held in Morehead City, North Carolina, officials were available to answer questions about the property. Rock testified that he heard nothing at the time which contradicted anything said during previous conversations with Corps and GSA officials. The only other witness who was present at the auction recalled overhearing questions about the easement, but paid little attention to the discussion. He did not say what plans the questioners had nor, indeed, what property was being addressed. None of this testimony is evidence that any representations were made about the easement retained by the United States. Even less is it evidence that fraudulent misrepresentations were made to the detriment of Rock or any of his successors in interest, including plaintiffs.

There was considerable testimony about what was said thereafter when the property successively changed hands until coming to rest with plaintiffs. All of this evidence is irrelevant because it involved events and conversations among non-government persons interested in the buying and selling of the property. No involvement by government officials in these transactions was shown. The most that appears is that when Coleman bought the property he was given a copy of the auctioneer's advertising bro-

chure and a copy of the original report of excess property. He claims to have relied on these documents to decide that the easement property could be used for residential development.

The excess property report, however, was an internal government document and was not a representation of land use to anyone. That document initially indicated the property might be used for dwelling purposes, but had been successively amended deleting that reference. In any event, it had been superseded by a subsequent GSA sponsored appraisal of the property which determined that the best use was for timber growing and possibly temporary or seasonal use by sportsmen. Accordingly, GSA classified the property as agricultural and noted timber growth as the highest and best use of it. Testimony showed that while some of the participants in the subsequent land transactions were aware of the brochure and the initial internal government document, they were unaware that the document had been amended and ultimately superseded by the appraisal.

Plaintiffs also claim to have relied on the observed extensive development in other areas along the Waterway as comfort for their plans. This reliance also was not mentioned to the Corps before litigation began. The discussion above shows that none of the other development was remotely like that contemplated by Sea-Gate. Had plaintiffs consulted with the Corps before embarking on the project, as the record shows is customary along the Waterway, they would have known the government's position. An earlier prospective purchaser of the same property approached the Corps and was advised that the government would not release its easement. Plaintiff Reeves directed his own people to consult as well, but they did not do it. The asserted reliance without consultation was not reasonable.

As a matter of at least inequitable treatment, plaintiffs claim that the government agreed to its designated spoil disposal sites, in reliance upon which they spent considerable funds to secure options on 361.5 acres.

The government then reneged on what was intended by all to be a complete resolution of the difficulties with the Corps of Engineers.

The evidence does not support this recitation. What it shows is that in the face of Sea-Gate's development plans in the right-of-way easement and the avowed intent to proceed regardless of whether or not a permit for the marina was issued, the Wilmington District considered and inspected Sea-Gate's proposed sites as a fallback position if for policy reasons or otherwise the development was not stopped. Plaintiffs misinterpret, and therefore erroneously rely on, a letter from the district engineer to the South Atlantic Division on April 6, 1973, which recommended acceptance of the proposed spoil disposal sites only if the Corps could not keep the entire right-of-way easement free from development by Sea-Gate. That letter did not recommend that the permit be issued and development allowed to proceed. The response of the South Atlantic Division was to recommend that Sea-Gate's permit be denied and that a litigation report be prepared. As for plaintiffs' allegations of large expenditures for the options in reliance on the supposed agreement, if the options were not exercised, the funds were to be returned, as indeed they were.

## STATUTORY VIOLATIONS

 Plaintiffs say that the United States has no statutory authority to hold an easement for the future enlargement of the Waterway, and even if it does, it had always interpreted the right-of-way easement as limited to spoil disposal. As to the first point, statutory authority for the United States to hold lands in fee-simple, in the absence of anything to the contrary, would also include the lesser privilege of an easement. *See generally Barrett v. Kunzig*, 331 F.Supp. 266, 271 (M.D.Tenn.1971). As to the latter point, there is no evidence that defendant ever so interpreted the easement language and the unequivocal words used need no interpretation now.

■ Plaintiffs' tangentially related claim that the government made an error in drafting the right-of-way easement before the sale of the property in 1957, that it meant to retain only a spoil disposal easement, is likewise unavailing. There was no evidence to that effect, the closest being testimony of one witness who had not participated in the easement decision. He testified, "In my opinion, they meant to select a spoil disposal easement; that's my opinion. But perhaps that's not true. I don't know what the hell I'm trying to say." That testimony does not help plaintiffs and appears, in any event, to have referred to another tract of land in the area.

Plaintiffs have resurrected their complaints about the failure of the Corps to issue a permit for the construction of a marina at Sea-Gate. Again, this was the subject of litigation in the United States District Court and was compromised by the parties and the suit dismissed. This issue was not thought important enough by plaintiffs' experts to mention as a factor in the asserted damages. This is probably because the original plans for the development did not include a marina and, apparently as an afterthought, it was added in 1972 to make use of an excavated area from which road building materials had been taken. Of course, as a result of the settlement of the suit in district court, the Corps issued the permit in August of 1974.

■ The court concludes that plaintiffs suffered no detriment by this delay. Even if they had, however, there was no impropriety or statutory violation in the Corps' actions in processing the permit application.

In the first place, the Corps denied the permit application in October of 1973 because to have issued it would not have been consistent with the recommendation that the United States go to court to protect the easement. That was prudent and is sufficient justification for denial of the permit under the circumstances.

Contrary to plaintiffs' position that the Corps has no authority to attempt to control a permit applicant's activities on lands not in the navigable waters of the United States, precedent and practice shows this to be fully appropriate. The Corps considered Sea-Gate's application under section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403. Section 10 does not limit factors that may be considered when deciding whether to issue or deny a permit. All factors bearing on the public interest may be considered, not only the effects of the subject of the permit, here the marina. *See United States ex rel. Great House v. Dern,* 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250 (1933); *Bankers Life & Casualty Co. v. Callaway,* 530 F.2d 625, 633–34 (5th Cir.1976); *DiVosta Rentals, Inc. v. Lee,* 488 F.2d 674 (5th Cir.1973); *Zabel v. Tabb,* 430 F.2d 199 (5th Cir.1970).

Until 1958, as a general practice the Corps confined its review of permit applications under section 10 to consideration of the effects of the proposals on navigation. *But see United States ex rel. Great House v. Dern,* 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250 (1933). With passage of the Fish and Wildlife Coordination Act of 1958, 16 U.S.C. § 662, the Corps was required to consult with the Fish and Wildlife Service before issuing permits under section 10, though the Service's views were only advisory. However, in 1967 the Secretaries of the Army and of the Interior agreed to coordination between the Corps and the Service and that Corps officials could not override objections of the Service. *See* 33 C.F.R. § 209.-120(d)(11) (1973). In late 1968, the Corps itself issued a regulation requiring consideration of "all relevant factors, including . . . the general public interest." *Id.* § 209.-120(d)(1) (1973). The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq., required the Corps to consider all relevant factors and make full disclosure in the course of deciding on permit applications. *See Zabel v. Tabb,* 430 F.2d 199, 209 (5th Cir.1970). Finally, section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1344, allowed the Secretary of the Army to issue permits for dredging and filling in navigable waterways only after notice and public hearings. This provision was given a broad

application in *National Resources Defense Council, Inc. v. Callaway*, 392 F.Supp. 685 (D.D.C.1975). *See also .Deltona Corp. v. United States*, 228 Ct.Cl. 476, 479, 657 F.2d 1184, 1186 (1981). But neither section 10 nor section 404 confers permit jurisdiction over activities solely on high ground. If a permit is denied, only the work contemplated in navigable waters is stopped, not that on fast lands.

Plaintiffs rely almost exclusively on the testimony of one of its experts who had retired from the Corps of Engineers in 1959. He testified that in his opinion the Corps should not have considered the effects of Sea-Gate's planned development on the government's easement rights as part of an evaluation of the marina permit application. As has been seen, however, this testimony reflects the Corps' general practice before the witness retired, and is inconsistent with the statutes, regulations and judicial developments since then. In any event, the same witness said that because of the building plans within the easement, he would not have issued a permit to Sea-Gate as a routine matter either. If discussions with Sea-Gate had proved unfruitful, he would have sought guidance from higher headquarters and would have attempted to delay the development until resolution of the matter. That, of course, is precisely what was done.

## OTHER CLAIMS

Plaintiffs list some subsidiary claims which should entitle them to compensation from the United States. They say the suit against Sea-Gate in district court caused adverse and damaging publicity. Both that suit and Sea-Gate's suit against the government to mandate issuance of a permit engendered publicity. But it appears the most adverse publicity was generated by Sea-Gate's own action in having a consultant draft and send out a press release portraying Sea-Gate as the victim of a government "land grab." This was sent to newspapers throughout North Carolina. Plaintiffs were, of course, privileged to make any comment they saw fit; they are not, however, entitled to compensation from the United States for the adverse results of their actions.

In a similar vein, plaintiffs' claim the Chief of Engineers directed that military commanders in North Carolina be asked to tell their personnel not to buy property at Sea-Gate. The evidence shows, however, that the Chief of Engineers suggested that the district engineer contact the commanders and alert them to the government's right-of-way easement at Sea-Gate. Sea-Gate believed, and it was not illogical to suppose, that military personnel would be potential customers for the project. The evidence also shows that, while the district engineer took no action directly, he referred the matter to his legal staff, a member of which in turn advised the staff judge advocate at the Marine base at Camp Lejeune of the status of the Sea-Gate case. The public affairs office there apparently released some information about Sea-Gate, but there is no evidence of its content. In any event, there is no reason why military officers should not advise service members of potential legal problems involving property in which they might consider investing.

Plaintiffs contend that either the Corps of Engineers or the Department of Justice told the Department of Housing and Urban Development (HUD) that Sea-Gate was selling government property and this resulted in a threat and prospect of criminal action. It appears, however, that on a visit by the president of Sea-Gate to HUD to find out what effect the government's suit might have on its registration with the Office of Interstate Land Sales Registration, an official said that selling property owned by the government could result in criminal action against Sea-Gate. Sea-Gate's president promptly explained that the property was merely subject to an easement of the United States and that was the end of the matter.

## CONCLUSION

Plaintiffs have established no legal or equitable claim against the United States and any payment to them would be a gratuity.